**Eddie DOZIER et al., Plaintiffs,**

v.

**Bernard CHUPKA et al., Defendants.**

**Civ. A. No. 73-447.**

United States District Court,
S. D. Ohio, E. D.

Feb. 11, 1975.

Decree filed April 16, 1975.

Carolyn A. Watts, Columbus, Ohio, William D. Wells, New York City, for plaintiffs.

City Atty., James J. Hughes, Jr., Dale Crawford, Columbus, Ohio, for defendants.

Stephen J. Vergamini, J. Raymond Snowden, Columbus, Ohio, for intervenors.

## OPINION AND ORDER

KINNEARY, Chief Judge.

This matter is before the Court on the amended complaint of the plaintiffs, the answers of the defendants and of the intervening defendants, and on the motions to dismiss of the defendants and of the intervening defendants.[1] The plaintiffs allege that the defendants have been and are now discriminating racially when hiring firefighters onto the Columbus Fire Department.

Jurisdiction of the Court has been invoked under Title 28, United States Code, Sections 1343(3) and 1343(4), 2201 and 2202. Plaintiffs seek relief under the provisions of Title 42, United States Code, Sections 1981, 1983, 1985, 1986 and 2000e et seq. They assert a pendent claim for relief under Ohio Revised Code, Section 4112.01 et seq.

The purpose of the trial, as the parties agreed prior to trial, is to determine whether there has been or is racial discrimination in the hiring of firefighters by the Columbus Fire Department. Plaintiffs seek preliminary and final injunctive relief, and also seek declaratory relief.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Named plaintiffs are Eddie Dozier, Charles Wilson, Adrien Burks, Daniel Moon, John Starnes and Eddie Brown. They are black men who sought employment with the Columbus Fire Department [herein Fire Department] in 1973. They represent a class of past, present and future applicants to the Fire Department who applied or would have applied and completed the department's procedures for employment in 1973, had the hiring process not been terminated before its completion. As part of the hiring process in 1973, a written civil service examination was administered. The six named plaintiffs took that test.

Two groups other than the plaintiffs who also took the 1973 firefighter examination, have entered this action. These two groups of twenty-four and twenty-seven persons were granted leave to intervene as defendants [herein Intervenors].

2. The defendants are employees of the City of Columbus. They participated or would have participated in the selection of applicants who would become firefighters. Defendants John Duffey, Thelma Schoonover and Walter Smith are members of the Civil Service Commission [herein Commission]; Duffey is its president. Raymond Fadley is Chief of the Columbus Fire Department. Bernard Chupka is the Safety Director of the City of Columbus.

3. The Commission was empowered to administer an examination from which recruits for the Fire Department would be chosen in 1973, and had administered similar examinations for the Fire Department in prior years. Ohio Const., art. xv, § 10. See also Ohio Re-

---

1. The defendants and the intervenors filed memoranda in support of their argument that the Court lacks subject matter jurisdiction.

The Court treats these as motions, and disposes of them in this opinion.

vised Code, Sections 124.01(C), —.11(B) and —.23; Columbus, Ohio Charter, Sections 148(2), 149 and 150. The Commission, upon the basis of written examination and agility test, established a list of applicants eligible to become recruits in the Fire Department. This list of eligibles was submitted to Chupka with the recommendation of the Fire Department for selection as recruits. Whereupon, Chupka chose the recruits from among the recommended eligibles.

4. The Fire Department, whose purpose is to provide fire protection, periodically recruit new members into the force. Recently, it has recruited biennially, drawing upon applicants tested in 1968, 1970, 1972 and late 1973.

5. Most of the members of the Fire Department are white. At the time of trial there were 821 firefighters. Nineteen, or 2.31 percent of the force, were black. The Fire Department hired its first black firefighter in 1935, and maintained segregated firehouses until 1953, with blacks serving only at Firehouse No. 8.

6. In 1970,[2] the percentage of blacks residing in various local areas was as follows:

| Area of Residence | Percentage Of Blacks | Percentage of Blacks Between Ages 18–34 |
|---|---|---|
| Columbus | 18.5 | 14.5 |
| Franklin County | 12.5 | 10.5 |
| Columbus Standard Metropolitan Statistical Area | 11.6/10.7 * | 9.9 |

\* 1970/1973

The parties have stipulated the foregoing percentage of blacks in the age group of 18–34. This was apparently done in the belief that it is relevant to the age group of 20–31, the qualifying age group for those applying for positions as firefighters.

2. 1970 is used here, for it is the most relevant time for which accurate statistics are available. Statistics cited elsewhere in the opinion

The 821 firefighters in the Fire Department at the time of trial resided in various local areas as follows:

| Area of Residence | Number In The Area | Percentage Of Total |
|---|---|---|
| Columbus | 444 | 54.1 |
| Franklin County | 290 | 35.3 |
| Columbus Standard Metropolitan Statistical Area | 87 | 10.6 |

7. The defendants followed a procedure in recruiting firefighters in 1973 similar to that which they had done in prior years. The recruiting process was never completed in 1973. The application process did, and does, progress on the following lines.

Applicants commence the application process by taking a written, objective examination. They are required to apply a few weeks prior to this test. In 1973, applications could be tendered from September 11 to 25, and the examination was originally scheduled for September 29, although it was later rescheduled for September 29, October 1 and October 6. When one applies, he submits information on matters such as employment, education, residences, arrests and medical history.

Some applicants might be disqualified automatically, based solely on what was stated in the aforementioned application form. All the other applicants are permitted to take the written examination. The Commission conducts this examination and determines who passes it. The 1973 process did not proceed past this step.

Those applicants who pass the written examination next take a physical agility test. Firefighters assist in conducting this second test, although it is administered under the auspices of the Commission. One who passes the physical agility test is allowed to complete the rest of the hiring process, as hereafter described.

are chosen for relevancy in time, too, unless the Court expressly notes another reason for having chosen that statistic.

Applicants who pass the written and physical agility tests are ranked in an eligibility list. Their grade and relative rank are determined by adding the scores of the two tests and bonus points, if any, for certain kinds of military discharges.

Those on the eligibility list are subjected to a background investigation. The investigation is conducted by an officer of the Fire Department, whose major task is to verify information the applicant has previously given in response to questions asked of him in forms of application of the Fire Department. The officer is asked to subjectively judge the applicants. Applicants are interviewed by three senior officers of the Fire Department, who also subjectively judge the applicants. The Chief of the Fire Department reviews the opinions of the background investigator and the interviewing committee and makes his recommendations to the Director of Safety, who chooses from among the eligible recruits in a manner prescribed by regulation.[3]

Donald Werner, executive officer to Chief Fadley, assumed responsibility for recruiting in 1971. He testified how many applicants passed through each stage of the 1972 recruiting process, as is described below:

Applicants who passed the written examination; applicants able to take physical agility examination ..........335

  Applicants who failed to appear for physical examination .............. 16

  Applicants who failed physical agility examination .................... 32

Total remaining who passed physical agility examination; applicants upon whom a background investigation was made and who were able to take a physical examination ................287

  Applicants who failed physical examination ........................ 55

  Applicants disqualified because of background investigation or interview process ........................ 19

  Applicants Commission requested be removed from consideration .......... 3

Total remaining from which recruits could be chosen .....................210

  Applicants hired in 1972 .............125

8. Recruiting of applicants for the Fire Department is done through formal and informal methods. Informally, and not in an organized manner, firefighters might tell friends or relatives of upcoming recruitment periods. From this segment of informed members of the community, some could be expected to apply when recruitment officially commenced. Chief Fadley testified that many firefighters had actually come to the Fire Department in this manner.

The Commission is responsible for conducting the official recruitment. The Commission notifies interested civic groups and prospective applicants of upcoming written examinations; those receiving notice have earlier expressed a desire to receive this notice. The Commission advertises in newspapers of general and minority circulation, and on radio and television stations. In 1973, the Commission advertised on a minority radio station also.

9. One hundred twenty-one of the five hundred one men who took the written examination in late 1973 were black. This was a substantial increase over prior years in the number of blacks who took the test.[4] The increase in black

---

3. The Court has appended to the opinion summaries or copies of the application, forms used by the background investigator, forms of the interviewing committee and a "pre-interview" form, the purpose of which is discussed *infra* in finding of fact No. 18.

4. This is an inferable conclusion. Chief Werner testified that five blacks were interviewed by the three member committee in 1972, and that one failed the interview. Thirty-four blacks passed the written examination,

most of whom could be expected to pass through the interview (See finding of fact 8). Therefore, the number of blacks applying in 1973 was almost 700 percent greater than the number who applied in 1972.

Franklin Weir, executive director of the Commission, testified about the large number of blacks he had seen take the Fire Department written examination in prior years. The Court does not adopt his estimates in its findings of fact.

applicants may be credited to the work done by two black firefighters, Russell Dandridge and Lemuel Ferguson.

Dandridge sought assistance from senior members of the Fire Department in recruiting more blacks to apply to the Fire Department in 1973. The Fire Department did not provide him with funds necessary to implement his ideas. Dandridge approached the Columbus Metropolitan Area Community Action Organization [hereafter CMACAO], a social service organization. Although unable to provide him with funds, it did provide him space in which to conduct his program.

Ferguson and Dandridge encouraged blacks to apply to the Fire Department. They attended job fairs and spoke at meetings of civic organizations to encourage blacks to apply. Dandridge held classes at the building CMACAO provided in order to prepare applicants for the written test. In response to Dandridge's question of how to prepare applicants for the Commission's examination, Weir recommended that they use a book on firefighter examinations published by Arco (a publisher of books which examinees in many areas may use to prepare for examinations). Dandridge purchased the Arco books with his own funds. He estimates that seventy applicants participated in his training program. Some of the applicants complained, after having taken the Commission's test, that studying the Arco book did not help them prepare for the Commission's examination.

The City of Columbus established an ad hoc committee whose purpose was to determine how to raise the number of blacks in the city's uniformed services; the committee's primary purpose was to raise the number of blacks in the fire and police departments. The city established a recruiting office in October, 1973 in which Ferguson now works.

10. A person receiving notice of the application process for the 1973 firefighters examination was informed of qualifying requirements by this notice. He had to apply from September 11–25, 1973. His height and weight in 1973 could range from 5′7″–6′4″, and from 135–225 pounds.

Generally, after applying, an applicant may be disqualified automatically for medical reasons, for having been dishonorably discharged from the military or, until 1972, for having been convicted of a felony as an adult. Information on all these matters is elicited on the application form. Those not disqualified may then take the written examination.

11. The written examination is administered by the Commission. It is an aptitude test, not an achievement test. If an aptitude test is a "valid" predictor, it measures one's ability to learn a skill rather than how well he presently knows that skill.

12. An applicant to the Fire Department is required to have a high school diploma, or to pass or have passed the GED, a test accepted as the equivalent of a high school diploma. Statistics indicate that in March, 1972 the average black American male had completed 11.6 years of school, whereas the average white American male had completed 12.5 years of school. Black men tend not to graduate from high school. 1973 Department of Labor Statistics, Table 33.

Some firefighters now on the force lack a high school diploma and have not passed the GED test.[5]

13. The Fire Department takes into account whether an applicant has been convicted of a felony. He is questioned about his criminal record on the application form, and the background investigator checks police records to determine whether the applicant has a criminal record. The questions asked during the oral interview also cover the appli-

---

5. Plaintiffs apparently intended to prove that eighty-seven firefighters lack either credential. They refer to this number in their post-trial brief. However, they only proved at trial that a few specific firefighters lack either credential.

cant's prior criminal record. Although the existence of prior criminal convictions would no longer automatically disqualify an applicant, this practice having been discontinued in 1972, it may still have a substantial effect on the consideration an applicant might receive.

Chief Fadley and Donald Werner both testified about the consideration paid to an applicant's prior criminal record. It is important that firefighters not be prone to theft, since they often are in positions in which theft is possible, e. g. when they are in a person's house fighting a fire. A criminal record is an indication of criminal proclivities, in these men's view.

Plaintiffs submitted evidence that a disproportionate number of blacks were arrested for criminal offenses in Columbus in 1973. 1973 Columbus, Ohio, Division of Police Annual Report: Statistical Presentation, pp. 36, 39. The crimes for which arrests were made are not differentiated between felonies and misdemeanors. 14,024 criminal charges were filed against men between the ages of 20–34 in Columbus in 1973. 34.2 percent of the criminal charges filed against men of all ages in this period were filed against blacks. One might interpolate the same percentages to the 20–34 age bracket. The figure of 34.2 percent might be compared with the percentage of the Columbus area population which is black and male. These figures range from 9.9–18.5, depending upon which aspect of the Columbus area is viewed. *See* finding of fact 6, *supra.*

14. The Fire Department takes into account an applicant's prior military record. If he has been honorably discharged from military service he receives five points and if he has been honorably discharged with a disability, he receives ten points. These bonus points are added to the total score he receives for the written and the physical agility tests.

Blacks suffer dishonorable military discharges more than do whites. A report, Department of Defense, IV Report of the Task Force on the Administration of Military Justice in the Armed Forces (1972), p. 149, concludes that in the fiscal year 1971:

[i]n all services, blacks receive a lower percentage of honorable discharges and a higher percentage of general and undesirable discharge than whites of similar aptitude [measured in service aptitude tests].

The plaintiffs submitted no evidence on whether blacks are discharged from the military at rates disproportionate to whites for disabilities.

15. After taking and passing the written examination, an applicant is tested for physical agility. The Commission administers this test, too, although with the assistance of firefighters. The test measures performance on tests approximating skills a firefighter needs, e. g. carrying a heavy sack over an obstacle course. Applicants who fail the physical agility test cannot proceed further.

The Commission compiles a list of eligible candidates ranked in order of score. Sixty percent of an applicant's score is his written examination grade; forty percent of his score is his physical agility test grade. To these two scores are added his military discharge bonus points. These three items give each applicant his final score, upon which his rank on the eligibility list is determined.

16. After the eligibility list is established, the Fire Department has a pool from which to select trainees. As positions become available, the Fire Department commences the rest of the recruiting procedure, processing twice the number of candidates it needs to fill the available positions. Applicants take physical examinations. Applicants must answer a questionnaire, which elicits from them more detailed information than they provided on the original application form.

They undergo a background investigation and also an interview before senior Fire Department officers. The Chief of the Fire Department reviews the recommendations and findings of

those below him who have reviewed the applicants and makes recommendations to the Director of Safety. The Director of Safety, a municipal officer entirely outside the Fire Department, is vested with responsibility for selecting firefighter trainees from among the pool of eligible applicants.

17. A background investigation is conducted on each applicant on the eligibility list. In the past, Lieutenant Goss of the Fire Department has conducted the background investigations. He was an investigator for an insurance company before commencing work as a firefighter; this apparently is the only training and experience he has had for conducting background investigations.

The investigator's purpose is to determine the accuracy of information on the application form and on other forms, and to evaluate what he has perceived while conducting the investigation. He seeks information on each applicant's health, arrests and convictions, education, residences, finances (indebtedness, bankruptcies, insurance), employment, and military service. He reports whether there has been falsification of information by an applicant. The investigator also gives his own opinion of each applicant.[6]

18. After his background is investigated, an applicant appears before an interview committee. The committee has three members, each an assistant or battalion chief, or occasionally a captain. Since becoming the Fire Department official responsible for recruitment, Donald Werner has sat on the committee. The three committee members know the profile established in the background investigations.

An applicant might have to be interviewed a second time or undergo a polygraph examination, if he appears to have given varying answers earlier. Prior to being given a polygraph examination,

he would have to answer certain questions. These questions may be found in a paper entitled "pre-test interview." These questions are of a personal nature, somewhat similar to questions asked of all the applicants earlier in the recruiting process. However, they are blunt questions. It appears that the questions, which are about the applicant's personal and criminal behavior, are designed to adduce statements on which to base a polygraph test.

No evidence was submitted about how often the pre-test interview questions have actually been used.

The interviewer rates each interviewee numerically in twelve different areas. An applicant's maximum score can be 120; he needs 66 to pass the interview. The ratings go to the Chief of the Fire Department, who judges each eligible applicant and passes his recommendation on each applicant to the Director of Safety.

19. The Director of Safety selects the firefighter trainees from among the eligible applicants. He may consider no applicant more than four times. He must consider applicants in order of rank, and has available to him the applicant's file, which contains the Commission's tests results and the Fire Department documents, e. g., the interview committee's ratings, the background investigation report.

20. The 1973 applicants were administered the Public Personnel Association [hereafter PPA] test 20(b). It is a multiple choice aptitude test with 120 questions. In the three preceding recruitment periods for the Fire Department, the McCann test[7] had been used.

Dr. Michael Nigro was chief of testing for the Commission at the time the 1973 firefighter examination was administered. He testified that the PPA test was used solely because this was the only test of which the Commission pos-

---

6. The notation appears next to this question on the investigator's form that this information is only for use by the Fire Department. Inferentially, then, the Director of Safety

could not use the investigator's opinions of each applicant.

7. The McCann test was not more specifically identified by the parties.

sessed a sufficient number to administer to all applicants.

The test was administered on September 29, October 1 and October 6, 1973. The results were compiled. The Commission decided at a meeting on November 16, 1973 not to use the results of the PPA examination.

21. Dr. Nigro made three reports to the Commission about the racial impact of its tests. The first two reports were written on April 23 and May 29, 1973. The first report reviewed the results of a computer operation test the Commission had recently administered. The latter report reviewed all applications received by and all tests taken from the Commission in April, 1973.

Nigro concluded in the second report that the Commission's " . . . examination program is racially discriminatory." He reasoned that whites were better able to pass the tests; they passed in greater numbers, disproportionately better than blacks. Whites also passed with higher scores, again disproportionate to blacks. Especially when only a few vacancies are to be filled, the tests the Commission used in April adversely affected blacks.

Nigro determined that his conclusions about the racial impact of tests administered by the Commission in April were true for the PPA test, too. A review of the scores of those whites and blacks who passed the PPA test indicates the truth of his belief.[8]

| | | Failed | 68–70 | 71–79 | 80–89 | 90–99 | 100 + | Total Pass | Total Exam |
|---|---|---|---|---|---|---|---|---|---|
| Black | No. | 93 | 13 | 15 | 6 | 0 | 0 | 34 | 127 |
| | % | 73% | 38% | 44% | 18% | 0 | 0 | 27% | 100% |
| | | | | Mean Score = 59.5 | | | | | |
| White | No. | 58 | 14 | 80 | 111 | 76 | 21 | 302 | 360 |
| | % | 16% | 5% | 26% | 37% | 25% | 7% | 84% | 100% |
| | | | | Mean Score = 81.1 | | | | | |
| Other | No. | 3 | 0 | 3 | 3 | 3 | 0 | 9 | 12 |
| | % | 25% | 0% | 33% | 33% | 33% | 0 | 75% | 100% |
| | | | | Mean Score = 77.4 | | | | | |
| Overall | No. | 154 | 27 | 98 | 120 | 79 | 21 | 345 | 499 |
| | % | 31% | 8% | 28% | 35% | 23% | 6% | 69% | 100% |
| | | | | Mean Score = 75.54 | | | | | |

Sixty-nine percent of all applicants taking the PPA test passed. Eighty-four percent of the whites passed; twenty-seven percent of the blacks passed.

Nigro concluded that racial differences, or cultural differences which cut across racial lines, were the reasons which caused the different passing rates

between racial groups. Nigro recommended that the examination be set aside, and the Commission followed his recommendation.

22. A test is valid if it accurately measures that which it purports to measure. The PPA test would be valid if its results indicated who did and did not

8. There were fifty firefighter positions available in 1973; finding of fact 24. Ninety-seven whites scored higher than any black on the written examination. Assuming that

the results of the physical agility test did not seriously disrupt this pattern, whites as a group benefited from this test.

have the aptitude to learn firefighting. If the results did not indicate this, i. e. applicants passed with the same score even though they actually had different aptitudes to learn firefighting, it would not be a valid test. No measure was made of the PPA test's validity prior to the time when its results were discarded. Columbus has since conducted a study of the test's validity, relative to the performance of recruits in the Fire Department's training academy.

In prior years, after trainees in the Fire Department had been selected by the Safety Director, they would take ten weeks training at the academy. The Court heard testimony on this matter from Captain Joseph Keefer of the Fire Department, who has been associated with the academy. He testified that this ten weeks training period was used primarily to introduce trainees to situations they could expect to confront in their careers, and to introduce the trainees to the materials needed to master these situations.

Trainees were graded at the academy. The composite, or final, grade they received there was composed of grades received in (1) periodic written tests given to them during the ten week course, (2) instructor's observations and (3) a final, written examination.

Keefer testified that a firefighter might not use all the skills to which he was introduced at the academy. What skills he would use during his career depended upon the vagaries of the situations he encountered. However, while at the academy, a trainee learned many skills, e. g. hose evolutions, ladder raises, use of different tools, hydraulics, ventilating fires, and treatment for poisoning.

After leaving the academy, a trainee spent two or three years at fire stations designed to continue his training. The first year of this period was a proba-

tionary period. After spending the requisite amount of time at a training station, a firefighter could seek transfer to an emergency squad, i. e., a station other than a training station.

23. The City of Columbus employed the Personnel Research and Development Corporation [hereafter PRADCO] to determine the validity of the PPA examination. Dr. Frederick Carleton, an employee of PRADCO, concluded that the PPA examination validly predicts certain aspects of an applicant's performance.

In reports submitted in December, 1973, and January, 1974, Dr. Carleton concluded, and then reaffirmed his conclusion, that the PPA examination validly predicted four measures of an applicant's performance at the training academy. The PPA test established a correlation between those who scored well on it [9] and how they tested at the academy or phase examinations, teachers' observations (performance), the final examination and overall or cumulative average.

Dr. Carleton did not determine the PPA examination's differential validity, whether it predicted validly for whites and for blacks, each considered separately. He testified that he believed the test was probably differentially valid. In stating his belief, he relied upon his knowledge that other firefighter examinations have more validly predicted blacks' performances than whites.

Dr. James Kirkpatrick, the plaintiffs' expert witness, testified that the PPA test was probably not differentially valid.

24. Chief Fadley estimated that the 501 applicants who took the PPA examination in late 1973 were competing for fifty positions of firefighters.

25. None of the defendants acted with intent to discriminate against black applicants to the Fire Department.

9. The predictor Dr. Carleton used was not just the applicants' scores on the PPA examination. Rather, he used their cumulative scores, from which the eligibility list was established.

*Discussion*

*Statutory Remedies of the Plaintiffs; Defendants' Motions to Dismiss*

Plaintiffs have pleaded that rights guaranteed to them by Title 42 have been violated. The plaintiffs alleged violations of §§ 1981, 1983, 1985 and 1986 of Title 42 in their complaint. They amended their complaint to plead a violation of § 2000e–2(a) of Title 42.

■ Discriminatory intent is an essential element of a § 1985(3) claim. Snowden v. Hughes, 321 U.S. 1, 8, 64 S. Ct. 397, 88 L.Ed. 497 (1944); O'Hara v. Mattix, 255 F.Supp. 540, 543 (W.D.Mich. 1966). Plaintiffs failed to prove that the defendants acted with intent; plaintiffs' § 1985(3) claim fails. A § 1986 claim is dependent on a § 1985 claim. Therefore, plaintiffs' § 1986 claim also fails. Johnston v. National Broadcasting Company, Inc., 356 F.Supp. 904, 909–10 (E.D.N.Y.1973).

■ The plaintiffs properly pleaded §§ 1981 and 1983 claims. *E. g.*, Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507, 509 (D.Mass.), aff'd, 504 F.2d 1017 (1st Cir. 1974). Defendant's lack of intent does not bar the plaintiffs' action; lack of intent is no defense to a § 1981 or a § 1983 action. Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S. Ct. 2045, 32 L.Ed.2d 338 (1972).

■ The defendants and the intervenors move to dismiss plaintiffs' § 1983 claims. They argue that the City of Columbus is an actual defendant, even if it is not a named defendant. The City of Columbus enjoys sovereign immunity, and thus a § 1983 claim against it would be improper. The Court has rejected similar reasoning before, and rejects it now. Lopez v. Williams, 372 F.Supp. 1279 (S.D.Ohio 1973), aff'd. sub nom., Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The Court denies the defendants' and the intervenors' motions to dismiss plaintiffs' § 1983 claim.

Defendants move to dismiss plaintiffs' § 2000e et seq. claim. They argue that the plaintiffs have not followed the statutory prerequisites to filing a private § 2000e et seq. cause of action. § 2000e–5(f)(1) provides in pertinent part that:

[i]f a charge filed with the Commission . . . is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . .

Four of the named plaintiffs were notified by the Equal Employment Opportunity Commission [herein EEOC] that they were permitted to file private actions. Brown, Burks, Starnes and Wilson were notified in letters addressed to each of them, all of which were dated August 1, 1974, that 180 days has expired and that they could file private actions. The letters were submitted to the Court four days later, as this trial commenced, on August 5, 1974.

Defendants argue further that they could not file their § 2000e action until they had obtained notice of their right to sue from the EEOC. Here, the plaintiffs filed their § 2000e action by amending their complaint on December 10, 1973, almost eight months prior to trial.

■ The defendants' motion is without merit. The statutory scheme of 42 U.S.C. § 2000e et seq. has not been disrupted. The EEOC was allowed time to

investigate plaintiffs' charges and to attempt conciliation. The statute provides that failing to resolve the complaint in this manner, plaintiff may institute his own action. 42 U.S.C. § 2000e–5(f)(1). *See* Sanchez v. Standard Brands, Inc., 431 F.2d 455, 460–62 and note 1 (5th Cir. 1970). Hutchings v. United States Industries, Inc., 428 F.2d 303, 309 (5th Cir. 1970). The 1972 amendments to § 2000e et seq. have not changed this purpose of the statute.

■ The Court determines that in a slightly altered factual context, plaintiffs could clearly proceed on their § 2000e et seq. claim. *Arguendo*, the Court assumes that the plaintiffs did not amend their complaint to state a 2000e action. When they received notice of their right to sue in letters dated August 1, 1974, they could then have approached the Court for leave to amend their complaint to state a § 2000e et seq. cause of action. Rule 15(a) or (b), Fed.R.Civ.Proc., depending on when leave to amend was sought. Prejudice to the defendants is the standard by which the Court determines whether to grant leave to amend. Head v. Timken Roller Bearing Company, 486 F.2d 870, 873–75 (6th Cir. 1973). Although this situation is not before the Court, the Court believes that no prejudice would result, and so it would allow the amendment. The hypothetical case is similar to the actual case. The Court denies the defendants' motion to dismiss plaintiffs' § 2000e–2(a) claim.

■■ In an earlier opinion and order, dated July 31, 1974, the Court determined that this action was a proper class action. Two of the six named plaintiffs did not present notice from the EEOC of their right to sue. These two plaintiffs, Dozier and Moon, may not proceed against the defendants under § 2000e et seq. The other four named plaintiffs do represent the class. A § 2000e et seq. case ". . . is . . . a sort of class action for fellow employees similarly situated." Jenkins v. United

Gas Corporation, 400 F.2d 28, 33 (5th Cir. 1968).

■ Defendants' move to dismiss plaintiffs' claims for a declaratory judgment. They contend that 28 U.S.C. §§ 2201 and 2202 do not grant the Court subject matter jurisdiction to entertain actions for declaratory judgment independent of other bases of jurisdiction. This is correct. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed.2d 1194, (1950). The Court otherwise has jurisdiction over plaintiffs' claims. 28 U.S.C. §§ 1343(3) and –(4), 42 U.S.C. § 2000e–6 (b). The Court denies defendants' motion to dismiss plaintiffs' §§ 2201 and 2202 claim.

*Merits of the Case*

42 U.S.C. § 2000e–2(a) provides in pertinent part:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or . . .

Defendants do not argue that definitions for § 2000e–2(a) contained in § 2000e are inapplicable or not descriptive of them.

The Court notes that the processing of applicants into the Fire Department is divided into three stages. The Commission establishes an eligibility list, the Fire Department reviews and recommends eligible applicants, and the Director of Safety determines who should be hired. Three of the named defendants, Duffey, Schoonover and Smith, are Commission members and a fourth, Wier, is its executive director. The Chief of the Fire Department, Fadley, is another defendant. The last defendant, Chupka, is the Director of Safety. The plaintiffs have named those defendants who are

responsible for the entire processing of firefighter applicants.

The Court determines the merits of the case in a two step process. First, the plaintiffs and defendants must argue the discriminatory nature of the defendants' past practices. Assuming that they are discriminatory practices, the defendants may prove that these practices were related to job performance, that they used these practices in order to choose those applicants best able to fight fires. Discriminating in its broadest sense, choosing between one and another, is not prohibited. Not all discrimination is unlawful. Rather,

> [w]hat is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

This being a civil action, the plaintiffs, of course, have the burden of proving their case by a preponderance of the evidence. However, plaintiffs may establish a prima facie case by use of statistics which reveal a significant racial imbalance. Then the defendants must rebut the presumption that the racial imbalance is a result of discriminatory practices. E. g., Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335 n. 4 (2d Cir. 1973), petition for cert. filed, No. 74–543, 43 L.W. 3242 (U.S. Nov. 5, 1974). Cf. Rolfe v. County Board of Education of Lincoln County, Tenn., 391 F.2d 77, 80 (6th Cir. 1968).

The Court determines that the plaintiffs have made a *prima facie* showing of the racially adverse impact of the defendants' employment practices. 2.31 percent of the Fire Department's work force is black, compared to 9.9–18.5 percent of the population of the Columbus metropolitan community, depending upon which profile of the community is used for comparison. Applicants have been drawn into the Fire Department by a certain recruiting program; they must conform to objective criteria; they undergo subjective evaluation. Employment practices which are facially neutral but which perpetuate past discrimination are impermissible. Head v. Timken Roller Bearing Co., 486 F.2d 870, 879 (6th Cir. 1973).

The Fire Department's methods of recruitment have been inadequate for drawing a proportionate number of blacks into its work force. The Commission notified those people and groups interested in being notified of upcoming firefighter examinations. Firefighters on the force told acquaintances and relatives of upcoming firefighter examinations; whites only drew more whites to a predominantly white force.

By comparison, the extra curricular efforts of two black firefighters drew a greater number of black applicants to the firefighter examination than had come before. Compare these efforts with those used in Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507, 519–20 (D.Mass.), aff'd, 504 F.2d 1017 (1st Cir. 1974). The defendants' efforts were unsuccessful; they had a discriminatory effect. Cf. United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 139–40 (8th Cir. 1969); Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. at 519–20; Clark v. American Marine Corporation, 304 F.Supp. 603, 606 (E.D.La.1969).

The plaintiffs allege in their complaint that the defendants falsely conducted a recruiting program designed to get blacks to apply, knowing that discriminatory obstacles would prevent them from being hired. Implicit in this assertion is the finding that the defendants acted within discriminatory intent; the Court has not found this to be true. Thus, the Court determines that the defendants did not knowingly conduct false recruitment, although their recruiting efforts were insufficient to overcome racial imbalance.

Applicants were measured by objective criteria, observations about their past or present actions or status. Some of these measurements had a discriminatory effect. Blacks suffered by the defendants' use of requiring a high school education or its equivalent. Black men as a group are less educated than white men. The average education of a black man is less education than is necessary to graduate from high school. Defendants required that all applicants graduate from high school or pass a test of equivalency; an applicant's lack of either standard results in his automatic disqualification.

Use of the high school graduation standard favors white men over black men. The Fire Department has disproportionately few black firefighters. Thus, the Court concludes that the use of this standard has a discriminatory effect. Defendants have failed to rebut the plaintiffs' prima facie case; neither have they proved the job relatedness of this particular criterion. The defendants have not used an accurate enough (job related) standard to overcome the discriminatory effect of that standard.

A firefighter should be educated, but the defendants have not proved how educated he must be. *See* Griggs v. Duke Power Co., 401 U.S. 424 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Georgia Power Company, 474 F.2d 906, 918–19 (5th Cir. 1973).

■ Some firefighters lack either a high school diploma or its equivalent, yet apparently they continue to perform their duties. Use of the equivalent therefore appears not to be related to job performance. Its use is prohibited. *See*

Griggs v. Duke Power Co., 401 U.S. at 431–32, 91 S.Ct. 849.

The defendants also considered applicants' arrest and conviction records. An applicant must indicate when he has been arrested and the disposition of those arrests. Until 1972, an applicant was automatically disqualified if he was convicted of a felony as an adult. Black Columbus men as a group are arrested more than white Columbus men. An arrest, of course, is not proof of guilt.

■ Use of arrests [10] and convictions favors white Columbus men over black Columbus men. As is true for use of a high school diploma, defendants have used a criterion which has a discriminatory effect; defendants have failed to rebut plaintiffs' prima facie case that this criterion is not discriminatory. Although the defendants may be able to relate specific use of their knowledge of an applicant's arrests or convictions to choosing the best firefighters, they have not used this instrument in a manner related enough to job performance to overcome its discriminatory effect. *See* Gregory v. Litton Systems, Inc., 316 F.Supp. 401, 403 (C.D.Cal.1970), aff'd as modified, 472 F.2d 631 (9th Cir. 1972). *Cf.* Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1105 (E.D.Pa.1972), aff'd as modified, 473 F.2d 1029 (3d Cir. 1973).

■ The defendants took into consideration discharge from military service, awarding bonus points to those who received honorable discharges or disability discharges. Black men are disproportionately dishonorably discharged from the armed forces. Thus, this criteria also has a discriminatory effect.

10. All applicants were required to list arrests and disposition of those arrests. As will be discussed below, the Fire Department may have attempted to relate these questions to a determination of applicants' predilection for theft. If this were so, and the Court does accept defense testimony on this point, the defendants were still using tools too crude for their purpose. There appear to be no procedural safeguards to prevent a

Fire Department official from considering a man's arrest record (for any crime) and judging him accordingly. Thus, an applicant might suffer for an unwarranted arrest for a non-larcenous crime. An applicant could also suffer for a conviction of a non-larcenous crime. Blacks were arrested disproportionately in 1973, and suffer from the use of this instrument.

The defendants have offered no proof that this criterion is related to job performance.

Plaintiffs have failed to prove that any other objective criteria, i. e., standards judging an applicant based on what he has done, have had a discriminatory effect.

Fire Department officials repeatedly judged applicants as they progressed through the hiring process. Lieutenant Goss, a white, judged the standard of living of applicants and attitudes of applicants' wives toward their husbands' prospective employment; he gave his opinion of the applicants. A committee of three senior Fire Department officials interviewed applicants.[11] Chief Fadley made the recommendations the Director of Safety could use when judging who to hire as firefighters.

The Court has found no evidence whatsoever of intentional discrimination on the part of fire department officers or employees, or by any other person involved, in whatever manner, in the whole process of selecting firefighters in the City of Columbus. Chief Fadley, who testified, and Lieutenant Goss, who did not testify, both appear to have acted in good faith. As was true with use of objective criteria, the Court must review a standard used to hire firefighters which has resulted in a racially imbalanced force. The subjective processes have had a discriminatory effect.

■ Subjectively judging applicants is not criticized. It is necessary to establish a good working force. However, it is part of an entire process, the net result of which has been discriminatory. Although defendants have shown their motivation in making many of the subjective judgments they made, the Court determines that the subjective judgments have not been proved job related.

*See* Brown v. Gaston County Dyeing Machine Company, 457 F.2d 1377, 1382–83 (4th Cir.) cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Rowe v. General Motors Corporation, 457 F.2d 348, 358–59 (5th Cir. 1972); Stamps v. Detroit · Edison Co., 365 F. Supp. 87, 111–12 (E.D.Mich.1973).

■ The Court determines that the defendants have failed to rebut the plaintiffs' prima facie proof that they have acted discriminatorily. The defendants' practices, having been proved discriminatory, nevertheless may be justified by proof that these· actions are related to the good job performance of applicants who are hired to be firefighters. Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Many defense witnesses testified about the kind of person the Fire Department sought for employment. Firefighters need to be social and agreeable people; a firefighter lives with his squad one of every three days. A firefighter works for twenty-four hours and is then off forty-eight hours. They need to be people of integrity. They are public servants and must present a good image of the Fire Department to the public. They also are in situations in which they could easily steal, and so they must be honest, too.

Firefighters should not be prone to external pressures, so that they might do a better job. Thus, the Fire Department attempts to cull from the applicants whose who would use alcohol or other drugs, those who gamble, those who are poor financial risks. These are criteria of selection for the Fire Department, criteria already determined to be discriminatory, which the defendants now seek to justify as being job related. The defendants have failed to prove the

11. Donald Werner testified that one of five blacks and eighteen of one hundred seventy-six whites failed the oral interview or the background investigation. Twenty percent of the blacks failed; 10.22 percent of the whites failed. One might question the numerical insufficiency of the sample; however, this insufficiency is due to past discrimination.

job related quality of their selection criteria. The criteria, although probably of some merit, is still discriminatory.

The defendants argue that the question of the PPA examination's validity is moot. The Court disagrees. The examination was administered in late September and early October, 1973. This action was filed on November 1, 1973. At its meeting on November 16, 1973, the Commission decided to:

. . . withdraw the test results of the Firefighter examination and hold up creation of an eligible list until a new examination is provided that can be validated and approved by the federal court.

By November 16, the Commission knew the disparate racial effect of the PPA examination, although the results were not publicly known.

■■■ Were the Court to find the test's validity to be moot, it would be on the basis that the defendants have ceased using the test and "that 'there is no reasonable expectation that the wrong will be repeated.'" United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Defendants have not shown that they will not use the PPA test again. The decision to not use the test was made after, rather than before, this action was filed. See Jenkins v. United Gas Corporation, 400 F.2d 28, 33, n. 11 (5th Cir. 1968).

It appears probable that, but for this litigation, use of the PPA test would not have been withdrawn. The entire hiring procedure of the defendants would have occurred had the hiring processes not been stopped. Findings of Fact 1, 7. Cf. Rackley v. Trustees of Orangeburg Regional Hospital, 310 F.2d 141, 142 (4th Cir. 1962).

■■■ If a test adversely affects hiring, it must be proved that the test is valid or that no suitable alternative hiring methods exist. 29 C.F.R. § 1607.3 (1974).[12] This test would have been used and its use would have adversely affected hiring. Defendants have not shown that suitable alternative hiring methods existed. Therefore, they must validate the PPA examination.

Evidence of a test's validity:

. . . should consist of empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevent to the job . . . for which candidates are being evaluated. 29 C.F.R. § 1607.4(c) (1974).

The defendants must prove that the PPA examination predicts or significantly correlates to important elements of work behavior. In determining that the PPA examination has not been validated, the Court finds significant three aspects of the defendants' PRADCO studies.

■■■ A careful job analysis or study must be made of the work behavior the defendants would predict with the PPA examination. 29 C.F.R. § 1607.5(b)(3) (1974). No job analysis was performed here. Defendants suggest that "firefighter" is defined by the Department of Labor Dictionary of Occupational Titles. This is true, but the definition is not a sufficient job analysis. See Vulcan Soc. of N. Y. City Fire Dept., Inc. v. Civil Serv. Comm., 490 F.2d at 396 (2d Cir. 1973). No job analysis has been made.

The defendants must relate work behavior to the predictive test. Specifically at issue is whether the PPA examination is a good predictor. However, PRADCO related work behavior to the

---

12. The Court may look to the Guidelines on Employee Selection Procedures promulgated by the EEOC, 29 C.F.R., Part 1607, even though the Court is not obligated to follow them. Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387, 394 n. 8 (2d Cir. 1973).

combined scores of the PPA examination and the physical agility test. Dr. Carleton concludes that the combined scores are as accurate a predictor as the PPA score would be alone, but he offers no proof to support his conclusion. Supplemental PRADCO Report, p. 3, January, 1974. The Court questions whether use of the combined scores rather than the PPA examination score alone will establish a relation between the predictive test, i. e. the PPA examination, and work behavior.

█ Assuming that the predictor used, i. e. the combined scores, was accurate, the defendants must still relate the predictor to ". . . important elements of work behavior which comprise or are relevant to the job . ." The defendants have not related the predictor directly to the firefighter's job, but rather to performance of firefighters at the training academy. *See* finding of fact 22.

Captain Keefer testified that trainees learn skills at the academy they may use in their jobs later. Learning these skills, however, is not work behavior itself. PRADCO considered in its validity study written examinations given in late 1973 to present members of the Fire Department, apparently as part of the validity study. Two examinations, the PPA and the International Personnel Management Association [hereafter IPMA] tests, were administered. Dr. Carleton, of PRADCO, asserts that the IPMA has predicted actual job performance elsewhere in the United States. He found that the IPMA and the PPA tests validly predict performance at the training academy.

Training academy performance has been held not to be an important ele-ment of work behavior. Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187, 1202–03 (D.Md.) aff'd. and modified sub nom., Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973)[13] ; Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1090 (E.D.Pa. 1972), aff'd as modified, 473 F.2d 1029 (3d Cir. 1973). *See also* Vulcan Soc. of N. Y. City Fire Dept., Inc. v. Civil Serv. Com'n., 360 F.Supp. 1265, 1275 (S.D. N.Y.), aff'd, in part, cause remanded 490 F.2d 387 (2d Cir. 1973) (this issue is not reached, p. 397). Defendants' proof that the IPMA test has been used to predict actual job performance elsewhere is questionable. Even as Dr. Carleton notes:

> [i]t is recognized, of course, that test validity often proves to be situationally determined and . . . a test . . that is valid in one situation or location [the IPMA test] does not necessarily cross-validate to another situation.

Supplemental PRADCO Report, p. 10, January, 1974. *See also* 29 C.F.R. § 1667.8(a) (1974).

█ "Defendants' burden . . . is not to establish possibilities but to demonstrate strong probabilities." Vulcan Soc. of N. Y. City Fire Dept., Inc. v. Civil Serv. Com'n., 360 F.Supp. at 1276 (S.D.N.Y.), aff'd, 490 F.2d 387 (2d Cir. 1973) (footnote omitted). Defendants have not validated the PPA examination.

█ The Court rejects the defendants' reasoning that blacks' alleged lack of motivation to apply to become firefighters is justification for the present social imbalance of the Fire Department. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 232–33 (5th Cir. 1974).

---

13. *Harper* is very instructive. The district court invalidated a PPA firefighter's examination. Whether it was test 20(b) is not clear. However, the Court questioned using academy performance in order to validate the entrance examinations used by the defendants, one of which was the PPA examination. Harper v. Mayor and City Council, 359 F. Supp. at 1197, 1202–03.

Plaintiffs allege that defendants violated state law. The Court may entertain this claim under the theory of pendent jurisdiction. However, the Court's review of the record leads it to conclude that the plaintiffs have abandoned this claim. Therefore, the Court renders no decision on plaintiffs' claim of a violation of state law by the defendants.

The Court determines that the plaintiffs have sustained their burden of proving that the defendants violated rights guaranteed plaintiffs by 42 U.S.C. §§ 1981, 1983 and 2000e–2(a). The defendants' past practices of employment have had a discriminatory effect. The Court finds the defendants to have acted in good faith. Defendants failed to demonstrate that their past practices were not discriminatory or were job related.

## Conclusions of Law

1. The Court has jurisdiction over this action under Title 28, United States Code, Sections 1343(3) and 1343(4), 2201 and 2202, and Title 42, United States Code, Section 2000e–6(b).

2. The plaintiffs have established a prima facie case that racial discrimination has and is occurring in the hiring of firefighters onto the Columbus Fire Department. 2.31 percent of the 821 firefighters in the Columbus Fire Department in August, 1973, were black. In 1970, 18.5 percent of the population of the City of Columbus was black. 12.5 percent of the population of Franklin County, Ohio was black, and 11.6 percent of the Standard Metropolitan Statistical Area was black.

3. The plaintiffs' claims are properly maintained as class actions under Rule 23(b)(2), Fed.R.Civ.Proc. As noted in the Court's order of July 31, 1974, members of the class are:

. . . all past, present and future Black applicants for employment in the Fire Department and all Black persons who would apply or would have applied and complete [sic] the processing procedures for employment but for the Defendants' racially discriminatory hiring and employment practices and reputation.

4. All the defendants have been properly joined in this action.

5. The past recruiting policies of the defendants have had and have a racially discriminatory effect on hiring plaintiffs and members of the plaintiff class.

6. The use of certain objective criteria by which applicants were selected has had and would have had a racially discriminatory effect on hiring plaintiffs and members of the plaintiff class. The unsatisfactory objective criteria used are: requiring a high school education or passing an equivalency test; considering arrests and convictions; and awarding bonus points for military discharges which were honorable or for disabilities.

7. The use of certain subjective criteria by which applicants were selected has had and would have had a racially discriminatory effect on hiring plaintiffs and members of the plaintiff class. The unsatisfactory subjective criteria used are the use and reliance by the Director of Safety of the City of Columbus (a defendant) of opinions and conclusions of the background investigator, the interview committee and the Chief of the Fire Department.

8. Requiring the plaintiffs and members of the plaintiff class to pass the PPA examination 20(b) was racially discriminatory and had an adverse racial impact.

The defendants have not validated the PPA examination 20(b).

9. The plaintiffs have proved that the defendants acted discriminatorily by a preponderance of the evidence; the defendants have not rebutted the plaintiffs' prima facie case. Plaintiffs'

claims are properly maintained under Title 42, United States Code, Sections 1981, 1983 and 2000e–2(a).

10. The defendants have failed to prove that their employment practices are job related under Title 42, United States Code, Section 2000e–2(e).

11. The defendants' and intervenors' motions to dismiss are without merit and they are therefore denied.

12. The past actions of the defendants, as herein described, are declared to be discriminatory and the defendants are enjoined from continuing to practice them.

The Court will next fashion a remedy for defendant's discriminatory acts.

Whereupon, the Clerk of this Court shall enter judgment for the plaintiffs in accordance with this opinion.

It is so ordered.

### APPENDIX

1. Application—Information sought regarding:

Military service

Prior employment of Columbus

Physical or mental problems

List *ALL* arrests and traffic citations, *either* as a *juvenile or* as an *adult,* even those dismissed in court. Explain . . .*

Education

Marital status, dependents, sex

Driver's or chauffeur's license

Last two residences

Employment history

Five references

1. Physical Examination—"Preplacement Health Questionnaire" 103 questions concerning:

Chronic health problems—e. g., heavy chest colds, hay fever, wear glasses, poor hearing

Acute health problems—e. g., low blood pressure, hernia

Medical and biographical history—e. g., date of birth, date of last chest x-ray

Emotional health—e. g., need to drink at certain time of day, feelings of depression or unhappiness

Eight of the 103 questions were asked only of women

3. Pre-background investigation questionnaire

(1) Information sought regarding:

Personal, marital and arrest record

Questions about arrests:

Have you ever been detained for investigation or arrested by a Police Department or other law enforcement agency, either as a juvenile or adult?

Have you ever received a traffic citation? (Except parking and equipment violation.)

Were you ever disciplined (as a matter of military record) while in military service . . .?

If the answer to any of the above is "Yes" list [date, charge, penalty].

Educational record

Three references, five firefighters applicant knows personally

Residences

* The questions in the application, as is also true for the other five forms, have been summarized, unless they are directly quoted from the form, as has been done with this fourth question.

Financial record—e. g.:

Have you or your spouse ever had your wages attached?

Have you or your spouse ever been forced into bankruptcy?

Have you or your spouse ever filed for bankruptcy?

Have you or your spouse ever made application for trusteeship?

If appointed, do you anticipate any income other than fire department salary?

Have you or your spouse any civil action now pending against you?

Work history

Medical history

Industrial accident or sickness record

Military record

(2) Authority for release of information

(3) Affidavit of trust of answers in question (1)

(4) Authority for release of military and medical information

(5) Three personal inquiry waiver forms

4. Background investigator's report— "Fire Applicant Investigation report"

(1) (a) General appearance of property, whether renting or buying.

(b) Describe attitude of wife on firefighter work.

(2) (a) Religious affiliation, name of church and attendance.

(b) Lodges or other organizations of which he is a member.

(c) Describe type of people with whom applicant associates.

(3) Employment—Begin with first job.

(a) Name of Employer.

(b) Dates of Employment.

(c) Job Description.

(d) Quality of Employment.

(e) Any injuries while employed.

(f) Reason for Leaving?

(h) Would they re-hire?

(4) Credit Rating—Columbus Credit Bureau

(5) Current Military Status

(6) Personal Qualities

(a) Personality behavior.

(b) Judgment and level-headedness.

(c) Addictions to gambling, drinking or immoral conduct.

(d) Honesty, integrity, reliability and industriousness.

(7) Abilities and Skills—List any specific skills, including motor vehicle driving ability.

(8) Interviews with at least three responsible citizens who can give valid information concerning the applicant.

(9) Falsification—Report any apparently deliberate falsification of the original application or other records.

(10) Additional Remarks—Information of importance concerning subject not covered in above headings. Attach additional sheets if more space is needed to cover previous captions.

(11) Investigators Opinion of Subject. (For use by the Division of Fire ONLY).

[No. 4 has been quoted from the original. (3)(g) was omitted on the original and has been omitted here.]

5. Interviewer's Rating Form—"Oral Interview Rating Form."

See Joint Exhibit 6–e attached.

6. Pre-polygraph Questions—"Pre-Test Interview"

See Joint Exhibit 15 attached.

DIVISION OF FIRE–DEPARTMENT OF PUBLIC SAFETY  # 

ORAL INTERVIEW RATING FORM

Last Name of Applicant    First Name    M.I.    Date

INSTRUCTIONS: Each member of the Fire Examining Board should be fair, thorough, and impartial when rating each of the twelve following traits. Concentrate and rate one trait at a time. Very few applicants will receive the highest or the lowest rating. Disregard your general impression (Trait 12) as to the PERSONAL FITNESS of the applicant until after you have rated him on all the other traits. Whenever a doubt exists as to the rating you wish to give for a trait, always resolve that doubt in favor of the Fire Department. Each of the following trait was selected carefully for the contribution it can make in an overall appraisal of the personal fitness of the applicant.

EXPLANATION OF RATINGS IN TABLE

Ratings of ONE through FOUR are UNSATISFACTORY. A rating of FIVE may be acceptable but with reservations. Rating of SIX through TEN are acceptable ratings.

| | NONACCEPTABLE RISKS | | | | ACCEPTABLE RISKS | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VERY POOR | POOR | BELOW AVG. | JUST AVG. | GOOD | | VERY GOOD | EXCEL-LENT | OUT-STAND-ING |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 1. APPEARANCE. Is your first impression poor, good or excellent? Consider his dress, neatness, grooming, handshake, facial expressions, standing and sitting postures, poise and general bearing. Does he appear to be well-set-up, energetic and athletic, or slouchy, apathetic, and unimpressive? Does his general appearance inspire your confidence? | | | | | | | | | |
| 2. VOICE AND SPEECH. Is his expression clear and distinct or does he mumble and talk too soft and low? Has he an impediment in his speech? Nasalized, high pitched or normal? Has he a good vocabulary? Does he use slang or profanity? Does his voice sound irritating or pleasant to you? Eye to eye speech. | | | | | | | | | |
| 3. EMPLOYMENT ATTITUDE. Has he changed jobs frequently? Does he seem unsettled or does he usually hold a job? Has he been disciplined or discharged from past jobs? What has been his general attitude toward past employers and co-workers? Their attitudes toward the applicant? If you were a business owner would you hire him? | | | | | | | | | |
| 4 PERSONAL HISTORY. What is his educational, marital, and financial background? What were his grades and conduct in school? Pays his debts? Has he an arrest record? Will his background of experience assist him? Has his life been an asset or a liability to society? | | | | | | | | | |
| 5. IMPARTIALITY. Does applicant seem to be fair and tactful, or biased and unjust; considerate and polite or aggressive and ill-mannered Is he lacking in restraint and self-control or has he respect for all the rights of others? Would he inspire cooperation generally? | | | | | | | | | |
| 6. GENERAL INTERESTS. Is applicant aware of events and current affairs of importance to all citizens, that are occurring throughout the world, in the U.S.A. in Ohio, in Franklin County? Or is he only interested in that which directly and immediately affects him personally? What are his hobbies and recreational activities? | | | | | | | | | |
| 7. INTEREST IN THE FIRE PROFESSION. How long has applicant been interested in Fire work? Is he enthusiastic? What does he think is the most important service rendered by a Firefighter? The least important? Why? | | | | | | | | | |
| 8. ALERTNESS AND JUDGEMENT. Is he mentally alert with keen perception and comprehension, or does he misunderstand instructions or questions and require detailed explanations? Is he able to present his ideas clearly, logically, and convincingly, yet briefly? Considers all the facts and uses judgment in few, most, or all, of his decisions? | | | | | | | | | |
| 9. STABILITY. Is he normally adjusted, or prone to fail or have difficulty on being put to adaptional strain? Seems calm, steady and cool, or would he likely "blow up" in an emergency? Too sensitive, easily frustrated, erratic, timid, without initiative, impatient, over-bearing, or is he emotionally stable? | | | | | | | | | |
| 10. HONESTY AND INTEGRITY. Has he ever stolen anything? How long ago? What? How does he feel about it now? Remorseful or not? Did he tell the truth on the application? | | | | | | | | | |
| 11. PERSONALITY. Is he at ease with others and pleasant to deal with? Would he inspire confidence and respect? Would he be good for public relations? | | | | | | | | | |
| 12. PERSONAL FITNESS FOR THE POSITION. In the light of your rating what is your honest overall opinion as to the applicant's suitability for the position of Firefighter with this Department? Would he likely make a poor, average, good or Firefighter? | | | | | | | | | |
| TOTALS PER COLUMN | | | | | | | | | |

SIGNATURE OF RATING OFFICER

The sum of the ratings in all columns equals the total score achieved. This score represents a consensus of the rating officer. Insert total score achieved in space allotted. SIXTY–SIX is the minimum passing score. This is not a percentage score Total possible score is 120.

SCORE ACHIEVED _____ ☐ APPOINTMENT RECOMMENDED   ☐ NOT RECOMMENDED    PI-12–Revised 8-71

858

EXHIBIT
15

PRE-TEST INTERVIEW

1. What do you feel might disqualify you fron this job?_____
_____

2. Is your employment record good?_____
_____

3. When were you fired, or let go by mutual consent?_____
_____

4. Have you ever filed for bankruptcy?_____
_____

5. Have you ever been a member of any organization, or attended meetings of any organization which has a questionable history?  These can include the Communist Party, Black Panthers, the SDS?_____
_____

6. When is the last time you were involved in sex act with another male as a juvenile or an adult?_____
_____
_____

7. When was the last time you smoked or tried marijuana?  How many times?  And what other drugs have you tried?  LSD, HEROIN, OPIUM, SOPHERS, BARBITUATES, HASHISH, UPPERS, DOWNERS OR MESCALINE?  How Much?_____
_____
_____

8. What is the biggest thing you have ever stolen?  What was the value of the article?_____

9. Do you have any physical defects you are attempting to conceal?_____
_____

10. When is the last time you were in jail?  The last time you were detained? Have you ever been disciplined in the Military?  Have you ever received an Article 15 or Court Martial?_____
_____

11. Are you having any martial problems?_____

12. Do you feel that you are in good enough health to accept strenous training program?_____

_____

13. Have you ever had your drivers license suspended or revoked?_____

_____

_____

14. Have you knowingly bought or sold any stolen property?_____

_____

_____

15. Do you drink? How Much?_____

_____

16. Do you gamble? How much do you lose or win?_____

_____

APPLICANT'S NAME_____

Pre-Test Interview by_____

—◆—

## DECREE

KINNEARY, Chief Judge.

This matter is before the Court for determination of what relief shall be afforded the plaintiffs, in whose favor the Court rendered a decision on February 11, 1975. The Court has before it documentary evidence and suggestions submitted by the plaintiffs, the defendants and the intervenors.

The Court herein orders, adjudges and decrees:

1. Plaintiffs are entitled to a scheme of relief which will eradicate past discrimination and assure nondiscrimination among the races in the future. The defendants, their officials, agents, employees and all persons in concert or participation with them are enjoined from engaging in any act or practice which had, has or will have a discriminatory effect in the hiring of any member of the plaintiff class for employment as a firefighter with the Columbus Fire Department.

2. No use shall be made by the defendants of practices or procedures the Court heretofore has declared discriminatory. Defendants and their agents are enjoined from use of such discriminatory instruments.

3. The defendants who are members of the Civil Service Commission shall recruit applicants in a manner reasonably certain to achieve the objectives herein propounded. The Court notes that recruitment will be unnecessary in order for the defendants to obtain the class of trainees they seek to commence to train in summer, 1975.

4. Defendants will devise qualifications for the position of firefighters. The Court is advised that the Battelle Memorial Institute has been engaged to conduct such a task analysis. Defendants will develop criteria by which to select firefighter trainees, based upon the Battelle task analysis or any other such analysis.

5. Contemporaneous with the use of the criteria described above, defendants

will undertake the validation of such criteria. Validation will be conducted in all respects so that it complies with the Equal Employment Opportunity Guidelines on Testing as set forth in Title 29, Chapter XIV, Section 1607 of the Code of Federal Regulations, or such other law or guideline as may be in effect at the time of such validation. If at any time defendants determine that such devices do not conform to the Equal Employment Opportunity Guidelines on Testing, they will immediately cease to use such devices and make immediate efforts to develop or acquire new selection devices which can be validated in conformance with the Equal Opportunity Guidelines on Testing.

The Court is informed that defendants would like to reinstitute selection of firefighters at this time and have attempted to acquire criteria necessary to judge who they should hire. The defendants may use such criteria pending validation. They may proceed with their appointment processes in a time and manner they deem sufficient, within the strictures of this decree. They shall inform the plaintiffs and the Court of the criteria. Plaintiffs may object to these criteria in the manner and for the purposes provided in the next paragraph.

6. Defendants bear the responsibility for developing validated criteria, as has been heretofore described. They shall propose criteria and timely inform the plaintiffs and the court of these criteria. Plaintiffs shall timely make their objections. Failure of the plaintiffs to timely object shall constitute their approval. Defendants shall also timely inform the plaintiffs and the Court of validation of the criteria.

7. The method for achievement of nondiscrimination in the appointment of firefighters shall be achieved by:

(a) The adoption of a goal to be reached over a period of time. That goal must be the representation of minorities in the approximate percentage they bear to the general population, within and subject to the categories of residence and persons eligible for application.

(b) The appointment of blacks and others on a one on one basis beginning with the next·process for appointment and until the further order of this Court.

8. No preference will be given to those persons who applied in 1973 for appointment as fire fighters. Such persons will be allowed to participate on an equal basis with all others who now apply for appointment.

9. Nothing in this decree shall in any way be deemed to require or encourage defendants (a) to employ any person not qualified for a firefighter position with the Columbus Fire Department or (b) to in any way lower or refrain from increasing the standards for employment as firefighters at the Columbus Fire Department, provided that such standards are reasonably related to the qualifications of potential firefighters. This paragraph is preeminent to all other provisions of the decree and all other provisions shall be subject to modification in the event of any conflict.

10. Defendants are to disregard any provisions of the Charter of the City of Columbus, of laws of the State of Ohio, or of regulations or rules of the city or state, which conflict with this decree. For the limited purpose of complying with this decree and the orders of the Court in this action, they are enjoined from following any of the aforementioned inconsistent rules, regulations, charter provisions or laws.

The Court maintains a continuing jurisdiction of this action which jurisdiction includes, but is not limited to, its active face to face contact with all proper officials and employees of the City of Columbus charged with and responsible for the selection and appointment of firefighters for the purpose of approving the preparation and execution of all appointment processes.

The Court will receive argument on whether back pay should be awarded to qualifying members of the plaintiff class and on awarding attorneys' fees to the plaintiffs' attorneys. Counsel are referred to Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir., 1975) as a basis for their argument on back pay.