**Eddie DOZIER, et al., Plaintiffs,**

**v.**

**Bernard CHUPKA, et al., Defendants.**

**No. C–2–73–0447.**

United States District Court,
S.D. Ohio, E.D.

May 15, 1991.

Richard A. Frye, Jeffrey S. Bolyard, Daniel R. Swetnam, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for plaintiffs-intervenors.

Ronald J. O'Brien, Douglass K. Browell, Columbus, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the motion of the intervening plaintiffs, Brian J. Selegue, Bret E. Levin, and a class of similarly situated white male firefighter applicants (hereinafter "Selegue plaintiffs") to dissolve paragraph 5(b) of the injunction ordered in this case in 1975, as amended in 1986, and for prospective relief from the provisions of the amended injunction. Fed.R.Civ.P. 60(b)(5). For the reasons that follow, the Court grants the motion of the Selegue plaintiffs. In addition, the Court dissolves the injunction in its entirety.

## I. STATEMENT OF FACTS

What follows is a brief overview of the history of the *Dozier* injunction. The details of the terms of the injunction will be dealt with as necessary to resolve the pending dispute. In the original case, which began in 1973,[1] Eddie Dozier, Charles Wilson, Adrien Burks, Daniel Moon, John Starnes, and Eddie Brown ("the *Dozier* plaintiffs") filed a class action suit alleging that they had been the victims of discriminatory hiring practices by the Columbus Division of Fire. The Court found that the City of Columbus had utilized certain recruiting and hiring practices that had a discriminatory effect on the plaintiff class. *Dozier*, 395 F.Supp. at 851, 854. As a result of this finding, the Court issued a permanent injunction requiring the City to refrain from using certain objective hiring criteria,[2] and affirmatively ordered it to

---

1. It is unnecessary for purposes of this Opinion and Order to recite all of the facts of the original *Dozier* case. They are set forth in detail in the opinion itself. *See Dozier v. Chupka,* 395 F.Supp. 836 (S.D.Ohio 1975).

2. With respect to the selection criteria, the Court found the following to have had a racially discriminatory impact on blacks: requirement of a high school diploma or its equivalent; consideration of arrests and convictions in back-

develop and validate content-valid, job-related testing procedures,[3] to develop a more rigorous minority recruiting program,[4] and to institute a one-to-one hiring ratio of blacks to whites until the representation of black firefighters approximated the percentage they bore to the general population, which was found to be 19.4%. *Id.* at 860.

The record before the Court reveals that there was little litigation in the years following the initial injunction. Aside from various motions dealing with payment of attorneys' fees and the like, the first substantive matter to arise after 1975 occurred in 1979 when the proposed agility test for firefighter applicants was submitted to counsel for the plaintiff class, Fred Ransier, who approved its use for testing purposes. The Court approved its use on August 20, 1979. In 1980, the defendants presented to the Court a report of the testing and validation efforts for the cognitive portions of the entrance examination, known as the "Barrett Battery," which the plaintiffs did not accept. The cognitive testing procedure was then changed in De-

cember of 1985, and was subjected to validation review by an independent consulting company, known as Landy, Jacobs & Associates. *See* Affidavit of Ronald J. O'Brien, Attached Exh. By April of 1986, the defendants had circulated a copy of the Landy, Jacobs validating study to Mr. Ransier and the Court for review. The Court and the plaintiffs accepted the report as accurate,[5] as reflected by the Court's Order dated August 12, 1986, in which the Court modified the terms of the original injunction to reflect the achievement of nondiscrimination in the appointment of black firefighters by virtue of their numerical representation on the force.[6] As a result of the judicial finding of nondiscrimination, paragraph five was modified to allow selection of firefighting recruits on the basis of merit only. Paragraph 5(b), however, required the City to resume the one-to-one hiring ratio at any time the percentage of blacks fell below 19.4%, and to maintain the ratio until the imbalance was rectified. Significantly, there was no provision indicating when the modified injunction would terminate.

---

ground investigations; and the awarding of bonus points for honorable military discharges.

3. The cognitive test administered as a condition of employment in 1973, known as the PPA test, was found to be job-related, but it had never been tested for its differential validity—that is, whether it was as accurate a predictor for whites as for blacks. *Dozier,* 395 F.Supp. at 846. Because the Court concluded that the PPA test had an adverse impact on blacks, the City was ordered to develop and validate a new test as a term of the injunction.

4. The Court found that recruitment of applicants for the Fire Division was done largely through informal means, such as by word of mouth, or through family relatives already connected with the Fire Department. Although there were at least some formal recruitment efforts being made, they were insufficient to generate the numbers necessary to produce the successful black applicants needed to rebut the inference of discrimination that arose from the disproportionately low numbers of blacks then serving on the force. *Dozier,* 395 F.Supp. at 841. Indeed, the only regular recruitment of blacks was performed on a volunteer basis by two black firefighters, Russell Dandridge and Lemuel Ferguson. *Id.* at 842. Consequently, the City was ordered to recruit applicants in a manner reasonably certain to obtain a class of

trainees consistent with the minority hiring objectives set forth in the Court's Order. *Id.* at 859.

5. Paragraph six of the original injunction provided that development and circulation of validation studies was to be the defendants' responsibility. Paragraph six also provided that "Plaintiffs shall timely make their objections. *Failure of the Plaintiffs to timely object shall constitute their approval.*" (Emphasis added.) It was established at the hearing to consider the present motion to dissolve the *Dozier* injunction that Mr. Ransier received the Landy, Jacobs study, had the opportunity to object to it, and chose to interpose no objections. Tr. at 110–114. Accordingly, the plaintiffs are presumed to have accepted the Report as accurate.

6. The Court found, in paragraph 5 of the amended injunction, that blacks comprised 22.48% of the general population in Columbus, Ohio, and 15.29% of the population in Franklin County (the County embracing Columbus, Ohio), while the representation in the firefighting force was 23.52%. Although there had never been a finding to determine which of the two general population figures were appropriate, it is clear that black representation exceeded both figures. Equally clear was that the original target figure of 19.4% had been exceeded.

The next recorded activity in the case was Mr. Ransier's motion to withdraw as counsel, dated January 8, 1987, due to a conflict of interest which arose as a consequence of his appointment to the Civil Service Commission in Columbus, Ohio. The motion was granted on January 10, 1987. No other counsel was ever selected by the plaintiff class subsequent to Mr. Ransier's withdrawal, nor did the Court appoint new counsel, given that Mr. Ransier was retained and not court-appointed. Thus from 1987 until the present date, the *Dozier* plaintiffs have been without legal representation.

The final action in the case prior to 1991 was the defendants' request for a modification of the injunction to require a high school diploma as a condition of employment with the Fire Department. The request was made because a change in federal regulations required that emergency personnel responding to accidents on interstate highways were required to have Emergency Medical Technician certificates for which a high school diploma or a GED certificate was a prerequisite. The City proposed that the injunction be modified to require the diploma, and that recruits be allowed to obtain their diploma or GED while proceeding through the application and entrance process. The motion was granted on January 13, 1988, with no opposition from the *Dozier* plaintiffs.

The foregoing synopsis demonstrates the relative ease and lack of litigation encountered by the Court in administering the *Dozier* injunction for the first sixteen years of its existence. Thus what appeared at first to be the beginning of nothing less than a Homeric odyssey, was for sixteen years nothing more than smooth sailing in deep, placid water. Not until February 15, 1991, did the Siren's call lure the Court to the shoals of litigation. That call came in the form of a temporary restraining order filed by the Selegue plaintiffs who were seeking admission to the class of firefighting recruits which was scheduled to commence on March 4, 1991.

The temporary restraining order had its genesis in the selection of the 1991 firefighting class. During the spring of 1990, the Selegue plaintiffs, and approximately 1500 others, applied to the Civil Service Commission for employment as firefighters. Typically, once the top fifty applicants have been ranked by merit, the City then drafts a supplemental list of black applicants to be selected in the event that, after selecting applicants from the top fifty, the percentage of black representation on the force falls below 19.4%. The Selegue plaintiffs completed the required testing procedures, with Mr. Levin and Selegue ranked 29th and 30th respectively among all applicants. On February 1, 1991, the Civil Service Commission notified both men that they had been certified for appointment as firefighters, which meant that in all likelihood the two would be included in the upcoming class.[7] This result would have obtained because, after accounting for two positions reserved for women,[8] the City sought to fill thirty-six positions in the March, 1991 class. Subsequent to certification of the class, however, the City determined that only one black applicant had scored in the top fifty,[9] thus requiring a total of twelve blacks to be added to the class in order to achieve the 19.4% goal imposed upon the City by the *Dozier* injunction. Consequently, because only twenty-three white applicants would be named from the list, Messrs. Selegue and Levin were advised that they had little or no chance of being appointed to the March, 1991 class of entry level firefighters. With

7. Although the Selegue plaintiffs would need to complete final interviews with several city officials, it was conceded by the City that but for operation of paragraph 5(b) of the 1986 injunction, the two most likely would have been appointed to the class. Stipulation of Facts ¶ 25.

8. As a result of a separate action before this Court, *Brunet v. City of Columbus*, 642 F.Supp. 1214 (S.D.Ohio 1986), each firefighting class

must include relative proportions of male and female candidates achieving passing scores. *Id.* at 1253. Two women were eligible for the March 1991 class.

9. The next highest scoring black applicants were ranked 83, 122, 188, 192, 240, 284, 286, 325, 340, and 349. Supplemental Stipulation of Facts ¶ 39.

final selections for the class scheduled to be made on February 16, 1991, the Selegue plaintiffs sought and were granted the temporary restraining order issued on February 15, 1991.

On February 26, 1991, the Court issued a preliminary injunction which prohibited the City from making any hiring decisions for the March class which involved the use of race-related criteria. Proceeding in the absence of the hiring quota, the City hired the new recruit class, which included Messrs. Selegue and Levin, as well as several other of the white applicants who were to have been denied jobs under the *Dozier* order. Prior to certification of the 1991 class, blacks comprised 19.1% of the total firefighting force. As a result of the preliminary injunction issued in the *Selegue* case, only one black became part of the new class, thus reducing the black representation on the force to 18.6%. On March 13, 1991, the Court granted the Selegue plaintiffs motion to certify a plaintiff class, and to intervene in the *Dozier* case. Accordingly, the *Selegue* case is now proceeding under the *Dozier* case caption.

During the proceedings in the *Selegue* case, the twelve affected black recruits were not represented by counsel. In an effort to keep these individuals apprised of the action, the City was ordered to serve them with a copy of the Court's Opinion and Order granting the preliminary injunction, in which the Court instructed the affected black recruits to give notice in the event they desired to be heard at the final hearing. Of the original twelve blacks affected by the preliminary injunction, four chose to respond to the Court's request.[10] In a letter dated March 13, 1991, the four requested the Court to delay the hearing date until after they had had a chance to review all aspects of the hiring components of the *Dozier* injunction. The Court denied the request for a continuance of the hearing date, but treated it as a request to be heard. Although the four men appeared at the final hearing date, none was represented by counsel. Thus the Court invited them to submit in writing any matters they felt were pertinent to the Court's resolution of the case. In addition, Robert Pearson, President of the African–American Firefighters Association was invited to submit an *amicus curiae* brief. Only Mr. Pearson responded.

## II. STANDARD OF REVIEW

In reviewing the above matter, the Court is not without guidance. Both the Supreme Court and the Sixth Circuit Court of Appeals have recently examined the question of when and under what circumstances a structural injunction should be lifted.

In *Board of Education of Oklahoma City Public Schools v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the Supreme Court considered whether a district court had properly dissolved an injunction that established forced busing as a means of addressing racial discrimination in public education. The Court first distinguished remedial injunctions aimed at curing discrimination with other injunctions which were meant to operate in perpetuity. Citing *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), also a school desegregation case, the Court said that

> federal court decrees must directly address and relate to the constitutional violation [which gave rise to the decree]. Because of the inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at limiting a condition that does not violate the constitution or does not flow from such a violation.

*Dowell,* 111 S.Ct. at 637. Thus, the Court said that operation of the school system in compliance with the dictates of the fourteenth amendment would be a significant factor in concluding that the object of the desegregation litigation had been achieved. *Id.* at 636–37. Moreover, the Court recognized that, in the context of school desegregation, federal supervision was always in-

---

10. The four responding individuals were Johnny Cooper, Eric Mansfield, Myron Lowery, and Matthew Seward.

tended as a temporary measure. Once the constitutional violation addressed by the injunction has been eradicated, there no longer exists an underlying wrong to support continued federal supervision. *Id.* at 637.

In addition, the Court noted that a finding that "it was unlikely that the school board would return to its former ways" was necessary to a finding that the purpose of the injunction had been achieved, for it is the continuing danger of repeated illegality which justifies maintenance of such an injunction. *Id.* at 636–37 (citing *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968)). In determining whether recidivism is a possibility, the court is to look at compliance with previous orders, not merely the profession of the offending governmental unit. *Id.* at 637.

The Court's decision was based not only upon equal protection principles, but also upon its perception of the allocation of powers within the federal system. That remedial injunctions like the one there at issue are not meant to operate indefinitely is a correlative of the proper function and role of local participation in the ongoing affairs of a school board. The same principles obtain in a situation such as the one at issue in *Dozier*, for the Court's role has always been that of an overseer of a temporary judicial remedy, not that of a coparticipant with city government in the establishment of executive policy and execution of legislative decisionmaking. Such a view would circumvent utterly the electoral mandate and authority which alone inheres in our governmental representatives, and would do violence to basic notions of federalism.

Thus the Supreme Court concluded that upon a finding that the schools were operated in compliance with the dictates of the fourteenth amendment, *and* that a return to past discrimination was unlikely, a district court could conclude that the purposes of the injunction had been achieved. No additional showing of a "grievous wrong evoked by new and unforeseen conditions" need be shown. *Id.* Neither the principles

governing the entry and dissolution of injunctive decrees nor the commands of the equal protection clause require the Draconian result of condemning forever a school board to "judicial tutelage for the indefinite future." *Id.* at 638.

■ In *Youngblood v. Dalzell*, 925 F.2d 954 (6th Cir.1991), the Sixth Circuit examined the district court's termination of a consent decree which governed the hiring and promotion of blacks for the Cincinnati Fire Department. The court remanded the case because, despite belated achievement of the numerical quota, there remained outstanding objections to the then-current operation of the decree which had not been adequately addressed by the district court. The court first suggested that where, as in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), there is no disagreement as to achievement of the remedial goals, the court's inquiry may be brief. *Youngblood*, 925 F.2d at 960. The existence of a dispute about achievement of those goals, however, requires the court to examine whether, in light of the terms of the decree itself, its purposes have been fully achieved. *Id.* at 961. In addition, the court noted that because mere numerical goals were not talismanic of nondiscrimination, the lower court was also required to consider the more general goals of the decree which the terms were designed to accomplish. *Id.* Thus in addition to a general probing of the underlying goals of the decree, the district court was asked to examine the length of time the decree had been in effect and the continuing efficacy of its enforcement. *Id.* The injunction need not be left in place in perpetuity "particularly where as here there has been little legal activity concerning the decree in recent years." *Id.* Therefore, when taken together, *Dowell* and *Youngblood* require the reviewing court to examine current compliance with the dictates of the fourteenth amendment, achievement of the injunction's purpose, compliance with its terms, and the likelihood of a return to past discriminatory practices.

## III. TERMS OF THE INJUNCTION

The initial inquiry should begin, therefore, with an examination of the terms of the original injunction and the extent to which compliance has been achieved.[11] The essential terms of the injunction included elimination of the veterans preference procedure, discontinuation of examination of arrest and conviction records, elimination of the high school diploma requirement, active minority recruitment, development and validation of a content-valid, job-related entrance examination, and black representation of 19.4% in the Division of Fire.

### A. Veterans Preference

■ With respect to the veterans preference and the use of arrest records, there is agreement among the parties that compliance with these terms has been achieved. In the sixteen-year history of the injunction, there has never been an objection to this facet of the decree, nor has there been an allegation that these terms have been violated by the City. Indeed, the City has, by separate motion, requested that the Court dissolve the prohibition on the use of the veterans preference mechanism in light of intervening case law, in order that the City may proceed with plans to place a charter amendment on an upcoming ballot in an effort to reinstitute the award of bonus points.

Relying on *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the City argues that veterans bonus points do not run afoul of the equal protection principles contained in the fourteenth amendment. The Court in *Feeney* recognized that most laws classify individuals to some extent, despite the fact that the law itself treats them similarly. *Id.* at 272, 99 S.Ct. at 2292. Where the classification is rationally based, "uneven effects within a particular class are ordinarily of no constitutional concern." *Id.* It is, therefore, well settled that veteran preference programs, as a general rule, are valid notwithstanding that they may have an adverse impact. Accordingly, dissolution of this portion of the injunction is appropriate.

---

**11.** A complete statement of the original injunction may be found in the text of the *Dozier* opinion. *See Dozier*, 395 F.Supp. at 859–61. For purposes of this Opinion, the essential terms can be summarized as follows:

1. The first paragraph provided that the plaintiffs were entitled to a scheme of relief designed to eradicate past discrimination in hiring practices. This preamble contains language which is merely aspirational, and was effectuated by the program in its entirety.
2. The second paragraph forbade use of practices or procedures declared discriminatory by the Court in *Dozier*. The apparent target of this clause was elimination of examination of service records, criminal history, and requiring a high school diploma as conditions of employment. This clause was effectuated by eliminating these items from the hiring process.
3. The third paragraph required the Civil Service Commission to recruit applicants in a manner likely to obtain the objectives of the decree.
4. The fourth paragraph required the defendants to devise job qualifications for the position of firefighter.
5. The fifth paragraph instructed the defendants to undertake a validation study of the selection criteria to determine whether the criteria in fact worked as anticipated.

6. The sixth paragraph was essentially the same as the fifth, requiring the defendants to bear responsibility for developing validated criteria. The only perceptible difference between the two paragraphs is that the latter expressly mandates that the defendants bear responsibility for validating the tests. This provision also said that failure of the plaintiffs to object timely to validation would constitute approval.
7. The seventh paragraph required the percentage of black recruits to approximate the percentage they bore to the general population. The figure ultimately agreed upon was 19.4%. This paragraph also required that blacks were to be hired on a one-to-one basis until the percentage had been reached.
8. This paragraph was technical in nature, directing that the decree was not effective for those who applied for positions in 1973.
9. This section stated that the decree was not to be construed as mandating employment of unqualified applicants, or requiring that the defendants lower or refrain from raising the standards for employment, as long as such standards were reasonably related to legitimate job requirements for firefighting.
10. This paragraph directed the parties to disregard any municipal or state laws or regulations in conflict with this decree. It also provided for continuing jurisdiction over this action. Significantly, it made no mention of a termination date for federal jurisdiction.

## B. *High School Diploma*

■ The term removing a high school diploma as a requirement for employment was modified in 1988. As discussed earlier, a change in federal regulations required that emergency vehicle personnel traveling on interstate highways possess a high school diploma or its equivalent. Prior to the requested modification, there is no evidence that this term had ever been violated, or that any objection had ever been raised. From this evidence the Court presumes that full compliance was achieved.

## C. *Recruitment*

■ The majority of the evidence adduced at the hearing concerned recruitment. The City argues that its failure to comply with the recruiting goals set forth in the injunction, and the concomitant failure to dispel the inference of discrimination that such failure raises, requires the Court to maintain jurisdiction over this case in order to assure that the City is able to carry forward with its proposed plans to improve minority recruitment.

The testimony at the hearing established that the City was dissatisfied with the recruitment efforts and results since 1986. The evidence it presented, and the testimony of the witnesses themselves, however, lead to a different conclusion. Harry Greenlee, a black man who is the EEO compliance officer for the Division of Fire, testified that the City's recruitment efforts were insufficient. Hearing Transcript at 39 (hereinafter "Tr."). This belief was based in part upon the lack of time he was able to devote to recruitment due to his other job responsibilities, and the inadequate financial resources devoted to the program by the City. For example, Mr. Greenlee stated that only fifteen percent of his time was actually spent recruiting minorities.[12] *Id.* at 39. Further, only one

other individual, Lemuel Ferguson, is involved in the recruiting effort in an ongoing manner, spending only five to ten percent of his time in this endeavor. *Id.* at 53. In addition, Mr. Greenlee indicated that the annual budget for recruitment was inadequate to fund the kinds of programs necessary to significantly improve the recruitment statistics. Of the $100,000.00 requested for fiscal year 1990, only $10,000.00 was awarded. *Id.* at 41. Mr. Greenlee stated that the additional monies were needed to "divert more resources to recruiting, [and to] pull in more community organizations to assist ... in [the] effort because" the City is unable to improve its recruitment initiative alone. *Id.* at 39.

This testimony was consistent with that given by Larry James, also a black man, and the City Safety Director for the City of Columbus. He, too, characterized the City's recruitment efforts as "minor," *id.* at 96, and stated that a minimum of $50,000.00 would be needed in non-test years in order to adequately recruit minorities, and $100,000.00 in test years. *Id.* at 97. Mr. James also testified that the number of blacks hired by the Division of Fire between 1986 and 1991 was unsatisfactory, and that it would take at least six months to develop, with the help of an independent consultant, a coherent plan to address the problem, and at least another two years to implement the plan successfully. *Id.* at 100–101, 107–108.

From these facts the City suggests that the Court maintain jurisdiction to help it accomplish in the next three years that which it claims to have been unable to accomplish in the last sixteen. However, the testimony of the City's witnesses was inconsistent regarding the success of the recruitment efforts. With respect to the budget figures, the witnesses' testimony failed to acknowledge the significant increase in recruitment allocations since

---

12. This figure is somewhat misleading, however, given that he also testified that he spent much of his time in 1989 and early 1990 providing E.E.O. training to 2,600 police and fire employees. Tr. at 17, 20–21, 39. Now that this training is complete, Mr. Greenlee testified that he will spend about 20% of his time in recruitment. Tr. at 21, 40–42. He did not, however, explain why his recruitment efforts would increase only 5% when so much the time formerly spent on EEO training would now be available for allocation to other duties. Given that he cited no other commitments replacing the EEO training, the Court concludes that the 20% figure is lower than the time he will actually devote to minority recruitment.

1986. In 1986, for example, only $2,300.00 was allocated for recruitment, of which only $469.00 was actually spent. Plaintiffs' Exh. 7. In 1987, the budget was reduced to $2,132.00, and nothing was spent that year. *Id.* In 1988, no funds were budgeted, although the Police and Firefighters shared $6,332.00 for joint recruitment. Like 1987, no advertising funds were expended, nor were any requested. *Id.* In 1990, the Division of Fire received $10,000.00, of which $8,961.20 was devoted to newspaper and radio advertising. *Id.* Thus the budget for recruitment increased nearly five fold between 1986 and 1990, while the total expenditures increased over twenty fold. Moreover, these figures are exclusive of the salaries paid to Messrs. Greenlee and Ferguson. Tr. at 105.

While the monetary figures are modest, the trend has been to increase the recruitment budget, and the figures themselves indicate that the increase in spending has correlated with a significant increase in minority applicants. *Id.* at 60. This suggests that the current level of funding is adequate. For example, it is at once clear that black representation among test-takers has exceeded black representation in the general population at least since 1984. The percentage of black applicants in 1984, 1985, 1986, 1988, and 1990 was 27.8%, 26.5%, 26%, 25%, and 36%, respectively, while the black population in Franklin County was, in 1986, 15.29%.[13] *See* Plaintiffs' Exh. 8. Thus since 1984, and in the five years since the Court made a judicial finding of nondiscrimination, *see* 1986 Order modifying injunction, ¶ 5, the percentage of black recruits has actually increased, on average, to 28%, or nearly double the percentage of blacks in the general population. Moreover, while the actual number of black applicants has increased to 768 in 1990 from 654 in 1986, the number of white recruits has decreased to 2132 in 1990 from 2495 in 1986. Although there may be a variety of reasons for the inverse relation between black and white recruits, it is fair to conclude that it is at least due in part to improved recruitment of minority applicants. Despite the fact that Messrs. Greenlee and James believe that $100,000.00 is necessary to improve the recruitment program, it is clear that they obtained significant results with current levels of monetary and human resources. Thus the testimony respecting aspirational funding levels is irrelevant to the question whether the City has complied with the terms of the injunction.

Further, Barbara Gates, the Executive Director of the Columbus Civil Service Commission, testified that the City had only mixed results in the recruitment of minorities. *Id.* at 59. Yet when presented with the statistical figures for the number of black examinees in 1986 and 1988 (the very years Mr. James testified experienced inadequate minority recruitment), she conceded that the recruiting figures were "generally ... good." *Id.* at 60. With respect to the figures for 1990, she testified that the number of black applicants was "particularly good." *Id.* What she found troubling was not the recruitment of minorities, but rather the failure of the Fire Department to retain the applicants once they had been recruited. *Id.* Although she cited several reasons for the failure of retention, "it's clear that the single biggest ... obstacle [was] passing the written examination." *Id.* at 63. In other words, the difficulty in appointing black applicants lies not with poor recruitment efforts, but with the inability of the applicants to pass the exam. While poor performance on the exam (about which more will be said later) is troubling, it is a question separate from whether the City has made satisfactory efforts to publicize and facilitate test offerings "in a manner reasonably certain to obtain the objectives" of the original decree. *Dozier*, 395 F.Supp. at 859.

The conclusion that recruitment efforts are satisfactory is also supported by examination of the specific efforts made by the City. Lemuel Ferguson testified that pro-

---

**13.** The Court accepts the figure of 15.29% as a point of departure only, and not an indication of the relevant labor pool as that figure has come to be defined. *See, e.g., Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

motional posters, with the words "Females And Minorities Are Encouraged To Apply" displayed prominently on the face, *see* Plaintiffs' Exh. 1, were distributed to 750 locations in "high traffic" locations. Tr. at 48–49. Many of these locations, if not all of them, were located in minority neighborhoods. *Id.* at 48. In addition to other types of notices that were mailed to "a gamut" of places, *id.* at 22–23, various public speaking engagements, both solicited and unsolicited, were accepted in which recruitment presentations were made to different organizations, including the Mayor's EEO luncheon, which was sponsored for forty to fifty African–American ministers. *Id.* at 24.

Various forms of mass media were also employed in the recruitment drive. Channel 3, the Columbus public access channel, broadcasts a monthly television show produced by the City show entitled "On Equality," on which appeared several black firefighters discussing "opportunities and what they found since they [had joined] the Division of Fire." [14] *Id.* at 25; *see also* Plaintiffs' Exh. 5. Mr. Greenlee also testified that advertisements were purchased in two minority-owned newspapers, the Call–N–Post and The Black Communicator. Tr. at 25–26. The Call–N–Post, though distributed locally, originates in Cleveland, Ohio, with regional editions circulated in Cleveland and Canton, as well as Columbus. *Id.* at 52. No such advertisements were placed in the Columbus Dispatch, a newspaper of general circulation, for the 1990 exam. *Id.* at 51. In addition, radio advertisements were purchased on WCKX, a minority owned station.

Finally, and perhaps most significantly, the City provides a tutorial program in preparation for each exam, lasting approximately one to two weeks.[15] *Id.* at 31. The purpose of this program is to review and develop the skills necessary to compete successfully in the cognitive portion of the entrance exam. Additionally, there is a facility available to practice for the physical portion of the exam. *Id.* at 32. The tutorial program, though open to all recruits, was developed primarily for the development of black recruits. This conclusion is based upon the fact that the program was developed by the Civil Service Commission and Landy, Jacobs and Associates in conjunction with the City's ongoing obligations under the *Dozier* decree. Landy, Jacobs Technical Report Vol. I at 21–22. Its effectiveness as a recruitment mechanism is enhanced by the fact that the program is offered at the Martin Luther King Center, a community facility located on Mount Vernon Avenue, which is in the heart of the minority community in Columbus. *Id.* at 32. The fact that it is open to all applicants does not detract from the fact that its location serves to enhance access to members of the minority community.[16]

From the foregoing findings of fact, the Court concludes that the City has complied

---

**14.** No testimony was adduced to suggest that the City was required to pay for the air time for this interview. The Court assumes that the $10,000 recruitment expenditure was exclusive of this broadcast.

**15.** The tutorial program consists of two parts, an hour-long video training film that is aired at the Fire Academy and repeated on the Job Show on public access television for a two-week period before the exam. In addition, a study guide is mailed to the applicants for home preparation. *See* Landy, Jacobs Report, Vol. II, App. O. Again, it is unclear whether the $10,000 allocation for recruitment included payment, if any, for public access air time.

**16.** In addition to the specific efforts described, several other initiatives were undertaken by the City. The City contacted the Private Industry Council to work with their placement and business unit; sent letters to over fifty black churches asking their assistance in encouraging blacks to apply; sent letters to minority police recruits inviting them to apply and test for the Fire Division; sent minority speakers to high schools, met with students and counselors, and left promotional information; worked with an organization known as Jobs For Columbus Graduates; contacted the local NAACP and left ad information; contacted Columbus Urban League education and placement section encouraging minorities to apply; worked with the Northwest Vocational Center Fire training section encouraging their students to apply; sent letters to all Court-ordered groups; established contact with some community groups to increase recruitment of minorities; and placed literature in the African–American community encouraging blacks to apply. Plaintiffs' Exh. 3.

with the injunctive requirement that it endeavor to recruit minorities in a manner reasonably certain to achieve the goals of nondiscrimination. As a result of the various efforts by the City, the percentage of black applicants has consistently exceeded black representation in the general population since 1984, and by as much two and one half times in 1990.[17] Compliance with the recruitment term has been achieved.[18]

The posture of this case makes this conclusion a difficult one to reach, for under normal circumstances, the City's admission of noncompliance would present a formidable obstacle to any challenge of the remedial provisions of the injunction. The City has chosen to adopt for itself the very position that sixteen years ago it strenuously opposed. Yet the mere fact that the City now argues that it has continued to engage in behavior which gives rise to an inference of discrimination in no way obliges the Court to accept that conclusion, particularly where, as here, the argument appears to be disingenuous. First, it must be noted that the testimony of many of the witnesses at the hearing was lacking in credibility. Second, the City's inconsistent position during this litigation belies its arguments now.[19] Finally, and most important, the facts supporting the Court's conclusion that compliance has been and continues to be adequate are overwhelming.

As to the first concern, Messrs. Greenlee and James gave evasive and unresponsive answers to direct questions concerning specific components of the recruiting program.

17. This figure may, in fact, undercount the true magnitude of the success in recruitment given that the proper number for comparison is the percentage of qualified applicants in the relevant labor pool, not the racial composition of the general population. *See Wards Cove*, 490 U.S. at 650, 651 n. 6, 653–64, 109 S.Ct. at 2121, 2121 n. 6, 2123–28; *Richmond v. J.A. Crosen Co.*, 488 U.S. 469, 501, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989). *See also Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) ("[T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded."). Nevertheless, the statistics currently before the Court support a finding of compliance.

18. In their *amicus* brief, counsel for the African American Firefighters Association contends that the City does even less today than it did in 1975. *Amicus* Brief at 9. This statement is a gross mischaracterization of the record before the Court. For example, counsel contends that women have been allowed to practice the physical fitness portion of the exam while blacks have not. *Id.* Yet Mr. Greenlee testified that such facilities are available for all applicants. Tr. at 32. Counsel further offered that the City is not encouraging blacks to apply to the Fire Department, that no one is speaking at civic meetings, and that no test preparation is being undertaken by the City. *See Amicus* Brief at 9. There is no requirement to recite the record in order to conclude that these allegations are nothing short of astonishing. Given that the testimony and stipulated facts in this case clearly contradict counsel's protestations, these arguments merit no further discussion.

Ordinarily, the Court would be inclined to impose sanctions against counsel for so blatant a misstatement of facts and for its questionable propositions of current law. Rule 11 imposes on all attorneys an affirmative obligation to make a reasonable inquiry into the facts and law which support pleadings filed before the court. However, no additional expenses were generated as a result of counsel's actions, nor were these proceedings delayed. Accordingly, sanctions are inappropriate in this circumstance. Counsel *is admonished that society is* best served by adherence to the ethical and professional norms which serve to inform and advance the Court's inquiry, the law, and hence, his client.

19. On March 5, 1991, the City filed the Defendants' Motion To Dissolve Remedial Order And Terminate Continuing Jurisdiction. In it the City requested that the Court

find that the City does not discriminate in hiring entry level firefighters, find that the City has complied with the provisions of those previous orders, find that the City is administering a content valid examination in accordance with EEOC Uniform Guidelines, and based upon *such findings dissolve all previous* orders and terminate jurisdiction.

On March 26, 1991, the City filed a motion entitled Clarification Of Defendants' March 5, 1991 Motion To Dissolve and Formal Withdrawal. Here the City explained that it had only sought to avoid the possible inconsistent obligations that could arise in the event that resolution of the *Selegue* case created conflicts with the *Dozier* injunction. However, avoidance of inconsistent judgments could have been achieved in numerous other ways without arguing that the terms of this injunction had been met. A more likely cause for the sudden reversal in position is the enormous political outcry occasioned by the challenge to the *Dozier* injunction.

When asked, for example, for specific information about the length, substance, and target group of the tutorial program, Mr. Greenlee had little information to offer, despite his otherwise confident grasp of the various aspects of recruiting and budget proposals. *See* Tr. at 31–32. It is peculiar indeed that the witness would become so reticent when questioned about a program that was clearly an integral part of the recruitment process for which he is responsible. Similarly, when Mr. James was asked by the Court whether the City recruited whites as well as blacks, his answer was unresponsive.[20] The Court asked whether all or only some of the past recruitment activities benefitted the minority community directly in order to determine whether the proffered testimony was relevant to establish compliance with the injunction. The evasive responses of the witness lead to the conclusion that virtually all of the recruiting efforts referred to at the hearing are directed towards the minority community. This conclusion is further supported by the testimony of Mr. Greenlee on redirect examination. Substantially all of his recruitment efforts were directed towards minorities. *Id.* at 42. Thus the testimony suggesting that recruitment efforts were inadequate lacked credibility. When taken in conjunction with the overwhelming statistical and factual evidence adduced at the hearing, the Court concludes that despite the City's position to the contrary, the recruitment goal has been achieved.

## IV. TESTING PROCEDURES

■ The original injunction also required the City to develop and validate a content-valid and job-related testing program. The record before the Court reveals that the City commenced this process in 1975, immediately following issuance of the original injunction. Paragraph Four of the 1975 injunction instructed the defendants to retain an independent consulting firm to devise hiring selection criteria for entry-level firefighters as a basis upon which to develop a content-valid, job-related testing procedure. The Battelle Memorial Institute, an internationally recognized research and consulting firm located in Columbus, Ohio, was selected by the City to perform the initial study. Commissioned before the *Do-*

---

20. The following colloquy occurred:

Q. Where in terms of priority does [the hiring of a full-time person for recruitment] stand on your agenda?

A. In January of this year, as we attempted to go through the budget and revisit the budget with council, we are attempting to determine where the best efforts are going to be made in the recruitment area for minorities.

I have come to the opinion, in nontest years, there should be a minimum allocation of $50,000 a year. And in a test year, which we would be looking at in 1993, a minimum of $100,000.

Q. Will you—

The Court: To be devoted wholly to recruitment?

The witness: Yes, sir, in the division of fire.

The Court: That is recruitment of blacks, not whites?

The witness: Well—

The Court: You don't have to recruit whites, do you?

The witness: You have to recruit in every area, your Honor.

The Court: What do you actually do? You recruit whites as well as blacks?

The witness: Yes, sir.

The Court: Who do you go to in the white community? Like you do in the black community, as shown in one of the exhibits here?

The witness: Well—

The Court: Where's the necessity for that?

The witness: You post the job.

The Court: What is the necessity to recruit whites as well as blacks?

The witness: You have to have advertising, your Honor.

The Court: I say, what is the necessity?

The witness: I don't understand the question when you say, "What is the necessity."

The Court: Why is it necessary for the City of Columbus ... to go out and recruit whites as well as blacks?

The witness: Let me try it this way, your Honor. I think one has to determine the quality of candidates and where one wants to recruit, whether you do instate or out of state. Those decisions have to be made in order to recruit, whether they be black or whether they be white.

If you're going to go change your standards and go after the college group, and you say that you're going to recruit at Ohio State, your primary population is going to be caucasian. If you go to Central State, that's going to be minorities. It's a difficult question. It's not a yes or no answer.

Tr. at 97–99.

zier opinion was issued, the study focused on hiring criteria pertaining to physical abilities, sensory abilities, communication skills, reasoning and judgment skills, and personal and interpersonal skills. While not purporting to establish the test itself, the criteria it identified as pertinent to a valid testing procedure were to be used by the City in remedying the adverse impact the then-current tests had upon minorities. The report was completed and submitted to the Court on June 20, 1975.

While development of the testing procedure was ongoing, the Court approved firefighting classes on January 11, 1977, September 30, 1977, April 24, 1978, and November 28, 1978 based upon the one-to-one ratio mandated in paragraph 7(b) of the 1975 injunction. On August 20, 1979, after its submission to and approval by all the parties, the Court approved the defendants' validated Physical Agility Test.

On June 11, 1980, the defendants submitted their report on the testing and validation efforts with respect to the cognitive portions of the exam. After issuance of the 1975 order, the defendants utilized a series of written tests developed by Professor Gerald Barrett of the University of Akron. In the defendants' report to the Court, they indicated that although the "Barrett Battery" was a good predictor of job performance, there continued to be a significant adverse impact upon black testtakers. This fact was also noted by plaintiffs' counsel in their response of June 24, 1980 [21] objecting to the continued use of the Barrett Battery.

Development of the testing procedure continued until the winter of 1985, when the City administered a revised written and physical test developed under the direction of a private consulting firm known as Landy, Jacobs and Associates. On May 9, 1986, a status conference was held at which the three volume validation study was formally presented to the Court. In it the consultants confirmed that the revised testing procedure was content-valid and job-related. Mr. Ransier, counsel for the plaintiffs, received a copy of the validation report, filed no objections to it, see Tr. at 113, and was thus presumed to have accepted the findings it contained. On August 12, 1986, the Court modified the original injunction to reflect the success of the hiring practices of the City as well as compliance with the testing component of the 1975 injunction. The Executive Director of the Columbus Civil Service Commission testified at the most recent hearing that the cognitive portion of the exam continues to be content-valid under current EEO standards. Id. at 66–67, 78; see also Stipulation of Facts at ¶¶ 18, 20–21.

Despite compliance with this term of the injunction, several witnesses testified that the current testing program continues to adversely affect black applicants. For example, Mr. Greenlee stated that modification of the entire testing procedure had been discussed several times in the past, presumably to increase the pass rate among black applicants. Tr. at 29. Although the majority of his testimony concerned promotional and not entry level exams, Mr. Greenlee suggested that a passfail system of scoring as well as increased reliance on nontest-related factors could enhance success of black applicants. Id. at 28–30. He also stated that expanded tutorials for written and physical tests would help improve the pass rate. Id. at 30–32. Barbara Gates built upon on this theme by suggesting that the pass point of the test be lowered to one-half standard deviation below the mean score.[22] Id. at 64. The proposed pass point is closer to that which is normally used in civil service examinations,[23] and would result in an estimated

---

**21.** The Dozier plaintiffs stated that they were not financially able to employ an expert to examine the test, but noted that the scores continued to reflect a significant adverse impact.

**22.** Using the mean as the cut score, one-half of all applicants will pass the test. Tr. at 70. Moving to one-half standard deviation below the mean cut score would result in approximately

two-thirds of all applicants passing the exam. Id.

**23.** Ms. Gates explained that the Division of Fire is constrained by this Court's order in Brunet v. City of Columbus, 642 F.Supp. 1214 (1986), in which the pass point of the entrance examination was set at the mean score, instead of one-

increase in successful black applicants of approximately fifty percent. *Id.* at 63. In addition, she offered that extending the life of the eligible-hires list to four years from two years would allow more qualified black candidates to be hired since ordinarily only half of those eligible are actually hired over the two-year life of the list. *Id.* at 66. Thus by expanding the tutorial program, lowering the passing score, extending the useful life of the hiring list, and utilizing other, nontest-related criteria, the City could maintain the goal of 19.4% minority representation.

All of the testimony elicited addressed the question whether alternative testing methods could be fashioned to improve minority appointments on the firefighting force. Such testimony was presumably proffered to suggest that the existence of alternatives is somehow probative of the continuing existence of an employment practice raising an inference of discrimination. However, it is well settled that "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which the candidates are being evaluated.'" *Abermarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975) (citation omitted). Where the test is job-related, the

presence of an adverse impact is not indicative of continuing discrimination because the absence of minorities holding the at-issue positions is due to a dearth of successful non-white applicants for reasons that are not the City's fault. In such a case the City's selection methods or employment practices cannot be said to have had a "disparate impact" on nonwhites.[24] *Wards Cove,* 490 U.S. at 651–52, 109 S.Ct. at 2121–22. At issue, therefore, is whether the current test is job-related.

■ The testimony of the witnesses, though purporting to discredit the efficacy of the cognitive portion of the exam, had the opposite effect: all of the City officials testified that the exam was, and continues to be, valid.[25] Indeed, the *Dozier* plaintiff class accepted the test as content-valid and job-related five years ago when the validation study was first completed. Where, as here, there exists a job-related, professionally validated test, and there has been literally no litigation in the eleven years preceding the present challenge, there is no reason now to reexamine the entire testing process.[26] Once the test is shown to be job-related, an applicant's inability to pass the test fails to show disparate impact. Given that the purpose of the injunction was to eradicate discriminatory admissions tests, the existence of a validated test requires dissolution of this portion of the 1975.

---

half standard deviation below the mean score. *See Brunet,* 642 F.Supp. at 1253.

**24.** In the *amicus* brief counsel suggests that the adverse impact is a vestige of past discrimination, requiring the Court to retain jurisdiction over the City. Yet this argument fails to recognize that once the offending practices have been removed, the mere fact of racial imbalance or adverse impact fails even to state a *prima facie* case of disparate impact. *Wards Cove,* 490 U.S. at 651–52, 653, 109 S.Ct. at 2121–22, 2122. An injunction cannot be maintained over a party for reasons that would not pass muster under Rule 12(b)(6).

It is also argued that the test itself is invalid because the pass point is an "artificial and unnecessary barrier" keeping minorities from performing well. Indeed, it is suggested that the failure to analyze cultural and environmental factors in the validation study render it suspect. *See* Memorandum of James Pear-

son at 2. This is nothing more than an invitation to revisit, belatedly, the efficacy of the validation study. The time for such an excursion, however, has long passed.

**25.** The only exception was the City Safety Director who, though completely unfamiliar with the Landy, Jacobs report, nevertheless contended that a complete reevaluation of the test was in order. Tr. at 108. The Court gives little weight to such uninformed testimony.

**26.** This is not to suggest that the City is now free to ignore the deficiencies which they have identified given that they are obligated to do so under the Equal Employment Opportunity Guidelines. But their continuing obligation to comply with the law is a question separate from a federal court's power to enforce extraordinary remedial injunctions. A court's power in that regard is quite limited and must give way when the terms of the remedial decree have been achieved.

## V. RACIAL QUOTA

■ The final issue before the Court is the only one asserted by the Selegue plaintiffs: whether the racial hiring component contained in paragraph 7 of the 1975 injunction, as modified by paragraph five of the 1986 order, should have any continued validity. Paragraph 5(b) required the City to maintain a quota of 19.4% minority representation in the firefighting force. Failure to sustain that goal would require the City to resume the one-to-one hiring ratio set forth in the original injunction. Yet 19.4% was never meant to be talismanic of nondiscrimination, as though the number itself represented "an immutable and fundamental hiring object of the decree." *Youngblood,* 925 F.2d at 960. To the contrary, the quota was established as a temporary measure to assure minority representation for the period during which the City was developing selection criteria, recruitment programs, and validation studies in an effort to remedy past discrimination. Given that all of the aforementioned components of the hiring process have been achieved, it is clear that the quota no longer serves any meaningful function.

In its trial brief and at the hearing the City developed statistical projections for the future composition of the firefighting force based upon the hiring pattern of the past five years. For example, the defendants point out that since the one-to-one hiring ratio was modified in 1986, the percentage of black firefighters has fallen from 23.52% to 18.6%, or about a five percent decrease over the past five years. Defendants' Trial Brief at 2. Moreover, of the 324 firefighters appointed since 1986, only 13, or 4%, have been black. *Id.* For this reason the City seeks to have the quota continued while it continues to explore methods to improve the hiring process.

Such a request, however, is fundamentally at odds with the admonition in *Milliken*

that federal decrees exceed the authority of the court if they eliminate a condition that does not violate the constitution or are not tailored to cure the condition which was determined to be offensive. *Milliken,* 433 U.S. at 282, 97 S.Ct. at 2758. The condition that was found to violate the constitution in this case was a hiring practice that adversely affected minority recruits without any job-related justification. Having found the hiring deficiencies to have been corrected, there no longer exists a constitutional violation to support the quota. Thus there is no condition for the quota to correct.

Moreover, even if the hiring deficiencies still existed, retention of the quota would not be the appropriate response to the continuing violation. First, the 19.4% figure is no longer a meaningful goal within the framework of disparate impact analysis. Although it is true that gross statistical disparities may constitute a *prima facie* case of disparate impact under Title VII, "when special qualifications are required to fill particular jobs, comparisons to the general population ... have little probative value." *City of Richmond v. J.A. Crosen Co.,* 488 U.S. 469, 501–02, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) (quoting *Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)). In the context of employment, where special qualifications are necessary, "the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *Id.* (citing *Hazelwood,* 433 U.S. at 308, 97 S.Ct. at 2741; *Johnson v. Transportation Agency,* 480 U.S. 616, 651–56, 107 S.Ct. 1442, 1462–64, 94 L.Ed.2d 615 (1987) (O'Connor, J., concurring)).[27] Thus the 19.4% figure, which reflected the general black representation in Columbus, may not be the appropriate figure for any hiring goal which would obtain in this situation.

---

**27.** This result flows from the congressional admonition contained in 42 U.S.C. section 2000e–2(j), which provides in part:

Nothing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment to any individual or group because of race, color, religion, sex,

or national origin ... on account of an imbalance which may exist with respect to the total number or percentage of [such] persons employed by any employer ... in comparison with the total number or percentage of [such] persons ... in the available work force *in any community, State, section, or other area.*

Continuation of the racial quota, therefore, can no longer be justified.

The Selegue plaintiffs have also indicated their desire for an award of attorneys' fees in this matter. The Court will entertain their application when it is filed.

## VI.  CONCLUSION

Under the *Dowell* case, when it is shown that compliance with the dictates of the equal protection clause of the fourteenth amendment has been achieved, there is little likelihood of return to past discriminatory practices, and the vestiges of past discrimination have been eliminated to the extent practicable, dissolution of a structural injunction is appropriate. Here, a history of compliance with the terms of the injunction, significantly increased minority recruitment, and sustained use of a valid, job-related testing procedure remedies past discriminatory practices and satisfies the dictates of the fourteenth amendment. The testimony of Cindy Lazarus, President of the Columbus City Council, the City Safety Director, and the E.E.O. compliance officer, as well as the much publicized response of community and political leaders persuades the Court that a return to discriminatory practices is extremely unlikely. It is readily apparent that the vestiges of past discrimination to which the *Dozier* injunction was addressed have been effectively eliminated within the Columbus Division of Fire.

Some, undoubtedly, will understand dissolution of this injunction to signal judicial abandonment of our aspiration to rid society of racial bigotry and oppression. Yet such a view would distort utterly the import of this decision. Far from abandonment, it flows from the metamorphosis of the political process which, though once insensitive to its obligation to protect fundamental civil rights, is now responsive to its constituents and capable of promoting the practices which satisfy not only the fourteenth amendment, but basic notions of justice and fairness. It is not now, nor has it ever been, the role of the federal courts to assume, in the absence of extraordinary circumstances, the duty of the legislative or executive branches of local government. The decision to return to local control the maintenance of equitable hiring practices merely recognizes the constitutional preference for self-governance, and returns to the people the accountability for pursuing with vigor those constitutional precepts which promote fairness and equality, for indeed, whether as a society we are able to rid ourselves of racial intolerance depends ultimately not on the courts, but on the hearts, minds, and dedication of the people whom the courts are sworn to serve.

WHEREUPON, upon consideration and being duly advised, the Court finds the Selegue plaintiffs' motion for dissolution of paragraph 5(b) of the injunction as modified in 1986 to be meritorious, and it is, therefore, GRANTED. Further, the Court finds that the City's motion to dissolve that portion of the injunction dealing with the award of veterans bonus points is meritorious, and it, too, is GRANTED. Finally, the Court finds that the purposes the injunction was meant to achieve have been accomplished, and no constitutional violation exists to sustain further supervision over this matter. Accordingly, the injunction is hereby DISSOLVED in its entirety.

IT IS SO ORDERED.